No. 86-87

IN THE SUPREME COURT OF THE STATE OF MONTANA

1987

STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

EUDORA "CORKY" DANNELS,

Defendant and Appellant.

APPEAL FROM: District Court of the Twelfth Judicial District,
In and for the County of Hill,
The Honorable Peter L. Rapkoch, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Mark A. Suagee argued, Havre, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Clay Smith argued, Asst. Atty. General, Helena
Ronald W. Smith, County Attorney, Havre, Montana

Submitted: November 26, 1986

Decided: March 11, 1987

Filed: MAR 11 1987

*Ethel M. Harrison*

Clerk

Mr. Chief Justice J. A. Turnage delivered the Opinion of the Court.

Eudora "Corky" Dannels, defendant and appellant, was charged by information filed August 20, 1984, in the District Court of the Twelfth Judicial District, Hill County, with committing the crimes of deliberate homicide and conspiracy to commit deliberate homicide in violation of §§ 45-5-102 and 45-4-102, MCA. She pleaded not guilty to both charges. Trial began on March 4, 1985, and on March 11 the jury returned a verdict of guilty of deliberate homicide. Defendant was sentenced to fifty years imprisonment. She appeals from the verdict, and we affirm.

Defendant and Maurice Dannels were married in 1983. Defendant had two children by a previous marriage, John Wirtala and Jeni Moffit.

On July 20, 1984, defendant and her husband traveled to Havre, Montana, to attend the latter's 50th reunion of his high school graduating class. They had initially planned to stay at the Duck Inn; however, after seeing that motel, they decided to stay at the LeHavre Inn. The next day defendant phoned Wirtala in Great Falls to inform him of the change. That evening, July 21, defendant and Maurice Dannels attended various functions at the reunion and then returned to their room at around 1:00 a.m.

Sometime after 2:00 a.m. on the morning of July 22, Maurice Dannels heard a knock at his motel room door. He opened the door and was hit by Melvin Wendell. Dannels staggered back and Wendell began beating him. At the same time, Dan Johnson proceeded to ransack the room after first turning up the volume on the TV. Wendell continued to beat Dannels and placed a pillow on his face. Wendell could not hold Dannels down by himself so he shouted to Johnson for

2

help.  Johnson grabbed Dannels' wrists, and finally he went limp.

Wendell and Johnson next turned their attention to burglarizing the room.  They scattered various objects over the room and went through defendant's purse.  Wendell removed the rings from Maurice Dannels' fingers.  Defendant was in the bathroom during this entire time and remained there until both men left.

At around 3:45 a.m., defendant staggered into the motel office and told the night clerk: "They're after me."  Defendant's gown was torn, and she was nervous and shaking.  She asked the night clerk to call the police.

Officer Stevens of the Havre Police Department arrived at the LeHavre Inn shortly after receiving the night clerk's call.  After asking defendant some preliminary questions, he obtained a key to the motel room.  The door was partially open.  Upon entering the room, Officer Stevens noticed that the TV was blaring and saw Maurice Dannels on the far side of the room lying face down on the floor.  The victim had a strip of white cloth tied around his neck and a piece of plastic covered his mouth.  An autopsy later determined that the cause of death was asphyxia caused by the cloth which was tied around his neck.  Maurice Dannels had other injuries indicating that he had been severely beaten.

Sergeant Ritz and Officer Magnuson were called in to investigate the crime.  Officer Magnuson questioned defendant about what had happened.  Defendant told him that she had been in the bathroom when she heard a knock on the motel room door and heard her husband calling her name.  She opened the bathroom door and was immediately struck by someone.  That person demanded that defendant give him her rings.  After she complied, she was hit again.  She then closed the door and

3

remained in the bathroom until the men left. Magnuson left, and Officer Stevens continued the questioning.

Defendant told Stevens much the same story that she had told Officer Magnuson only moments before. However, there were a number of discrepancies. She stated that when the man asked her for her rings, she refused. The man then hit her again and forcibly removed the rings from her fingers. She was struck five more times and lost consciousness. Upon regaining consciousness, she remained in the bathroom for a while and then went to the motel office. While describing the blows she received, defendant pulled back her gown to reveal a bruise on the upper part of her left breast. During the questioning, which took place in the motel room office, defendant was wrapped in a blanket and smoked cigarettes and drank coffee.

After taking defendant's statement, the officers suggested that she go to the hospital to see about her injuries. Defendant stated initially that she did not want to go to the hospital but later agreed to be taken there. Defendant was brought to the emergency room of Northern Montana Hospital and examined by Dr. Thomas Booth. He reported that the bruise on defendant's chest was yellowish in color and could not have been sustained during the alleged burglary. Dr. Booth reached the same conclusion as to the bruise above her left eye and the abrasion on her nose. Dr. Booth told defendant of his conclusions. Defendant offered no explanation for the inconsistency.

After leaving the hospital, defendant went to the Havre Police Department headquarters. An interview with defendant, Sergeant Harada and Officer Stevens was recorded. Prior to the questioning, defendant was informed of her _Miranda_ rights. She told the officers the same story that she had

4

told Officer Stevens earlier. Defendant then left after two hours of questioning.

Dan Johnson testified at defendant's trial pursuant to a plea bargain agreement. He testified that Wendell called him and proposed that they burglarize a motel room in Havre in return for $1500. He stated that two other people were to murder the victim after the burglary and that no one was supposed to be in the room during the burglary.

Johnson testified further that he and Wendell flew from Missoula to Great Falls and were picked up at the airport by John Wirtala. After making various stops in Great Falls, Johnson and Wendell drove to Havre in Wirtala's car. Sometime after 2:00 a.m. on July 22, Wendell knocked on the motel room door where defendant and Maurice Dannels were staying. When Dannels answered, Wendell hit him in the face and entered the room. Johnson followed. He then saw defendant walk past him and go into the bathroom where she stayed until he and Wendell left. Immediately prior to their leaving the room, Johnson heard defendant tell Wendell: "You better take these." Defendant then handed her rings to Wendell. Johnson and Wendell subsequently drove back to Great Falls and met with Wirtala in defendant's home.

Defendant raises ten issues in her appeal:

1. Did the court's ruling refusing to authorize expenditures for the retention of a specific psychiatric expert to examine defendant on the possible existence of "battered woman syndrome" deprive defendant of the opportunity to present a defense and deny her the right to a fair trial?

2. Did the court err in denying defendant's motion to suppress (1) certain statements made by defendant to police officers and medical personnel on the night of the murder, and (2) the result of her medical examination on that night?

5

3. Did the court err in denying defendant's motion for a directed verdict on the grounds that the testimony of Dan Johnson was not sufficiently corroborated?

4. Is the verdict supported by substantial credible evidence?

5. Did the court commit error in violation of the Sixth Amendment, United States Constitution, and Rule 801(D)(2)(e), M.R.Evid., by allowing certain testimony of Dan Johnson?

6. Did the court abuse its discretion by refusing to grant immunity to Melvin Wendell so that he could be compelled to testify at trial?

7. Did the court err by admitting into evidence photographs of the injuries to defendant's face and left breast which were taken at the hospital during her examination?

8. Did any misconduct by the prosecutor during the trial prevent defendant from receiving a fair trial?

9. Did the court commit prejudicial cumulative error?

10. Did the court err in giving an instruction dealing with the concealment or destruction of evidence by defendant?

Prior to trial, defendant filed a motion requesting the court to authorize expenditures for an expert witness from Denver who would testify to the effects of "abused spouse" or "battered woman" syndrome. Although the court did authorize expenditures for local psychiatrists to testify on that subject, the court refused to do so for the expert from Denver. Defendant argues at length that the court's ruling was prejudicial and denied her the right to present a defense.

The use of "abused spouse syndrome" as a defense to a forcible felony is a recent occurrence. States which have considered this issue are divided on whether the syndrome in fact exists and, if so, whether it should be allowed as a

defense to a homicide charge. Although the issue is one of importance, the facts of this case do not mandate that we resolve this issue now.

Section 46-14-102, MCA, provides that applicable rule in determining whether evidence of a mental disease is relevant. It states:

> Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did or did not have a state of mind which is an element of the offense. [Emphasis added.]

Defendant did not seek to prove that she suffered from abused spouse syndrome and, as a result, did not have the necessary state of mind to commit the homicide. Rather, defendant planned to use the syndrome as an explanation for the reason she lied to the investigating officers as to the origin of her bruises. She sought the abused spouse syndrome testimony to buttress her credibility. Therefore, even if the court had authorized expenditures for the specific expert defendant wanted, the testimony from that expert would not have been relevant or admissible.

Defendant cites a number of cases in support of her position. However, in every case cited, the defendant used abused spouse syndrome to prove that she did not have the requisite state of mind to commit the offense. That is not the situation here. Under § 46-14-102, MCA, a defendant may not use evidence of abused spouse syndrome to support her credibility. Since that is the only reason defendant sought the testimony here, the court did not err in refusing to authorize expenditures for retention of the expert.

In her second issue, defendant contends that certain statements she made were taken in violation of Miranda. She argues that the statement she gave to Officer Stevens at the

LeHavre Inn was involuntary and taken in violation of _Miranda_, as was the "search" of her body at the hospital and the statement given by her at police headquarters. To support this assertion, she contends that she was in custody at the motel office when she spoke to Officer Stevens and that she was also in custody at the hospital.

The requirements of Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, come into play only when there is a "custodial interrogation." Often, it is difficult to determine whether an individual is in custody for purposes of _Miranda_. However, United States Supreme Court decisions since _Miranda_, as well as Montana Supreme Court decisions, have increasingly narrowed this area of uncertainty.

_Miranda_ defined custodial interrogatories as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." _Miranda_, 384 U.S. at 444. The fact that the questioning took place in a "coercive environment" does not suffice, by itself, to render the interrogation custodial. As the Court pointed out in Oregon v. Mathiason (1977), 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714:

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer _Miranda_ warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. _Miranda_ warnings are required only where there has been such a restriction on a

> person's freedom as to render him "in custody."

See also State v. Dupre (Mont. 1982), 650 P.2d 1381, 39 St.Rep. 1660.

We find no basis to conclude that defendant was in custody when she gave her statement to Officer Stevens. Defendant requested the night clerk to call the police. Therefore, the questioning was initiated pursuant to defendant's request and during the questioning, defendant was wrapped in a blanket, smoked cigarettes and drank coffee. Defendant was not placed under arrest at that time. Clearly, the questioning by Officer Stevens was no more than an on-the-scene investigation of a homicide.

Defendant argues that she was in custody because she was not allowed to return to her room. This argument is without merit. Defendant, with the exception of her room, was free to go anywhere. Preventing a witness from returning to the crime scene does not render that witness in custody.

Defendant further argues that all witnesses to a crime are considered suspects by the police. Since defendant was considered a suspect, Miranda warnings were required prior to questioning by the police. This argument is also without merit. Beckwith v. United States (1976), 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1, made it clear that Miranda warnings are not required where police officers question a person not in custody, even though that person is the "focus" of the investigation. Were we to accept defendant's argument, police officers would be required to give warnings to every witness whom they question. Such a result would stretch the holding of Miranda beyond recognition.

Likewise, defendant was not in custody when she was taken to the hospital. Although defendant initially stated that she did not want to go to the hospital, she later agreed

9

and consented to the medical examination. At no time during the examination did defendant request to leave or indicate that she did not want to be examined. In-hospital questioning of a person who is the focus of an investigation does not require Miranda warnings unless that person is "deprived of his freedom of action in any significant way." State v. Lapp (Mont. 1983), 658 P.2d 400, 402, 40 St.Rep. 120, 122. Clearly, defendant was not deprived of her freedom of action.

Finally Miranda warnings were not required prior to defendant's questioning at police headquarters. Defendant voluntarily went to the police station. She was not arrested prior to or subsequent to the questioning. She willingly answered the questions, and after the questioning was over, she left. The fact that the questioning took place at a police station does not, by itself, render defendant in custody. See Mathiason, supra. Defendant was not deprived of her freedom of action in any significant way and was not entitled to Miranda warnings prior to questioning.

Defendant next contends that the testimony of accomplice Dan Johnson was not sufficiently corroborated. Defendant contends further that since the bulk of the State's case rested on Johnson's testimony, the court erred in not directing a verdict in favor of defendant.

The proper standard to be applied in determining whether the testimony of an accomplice has been sufficiently corroborated is set forth in § 46-16-213, MCA:

> A conviction cannot be had on the testimony of one responsible or legally accountable for the same offense . . . unless the testimony is corroborated by other evidence which in itself and without the aid of the testimony of the one responsible or legally accountable for the same offense tends to connect the defendant with the commission of the offense. The corroboration is not

10

> sufficient if it merely shows the com-
> mission of the offense or the circum-
> stances thereof.

The connecting evidence may be circumstantial and need not establish a prima facie case of guilt. State v. Mitchell (Mont. 1981), 625 P.2d 1155, 38 St.Rep. 487. It is sufficient if it only tends to connect the defendant to commission of the crime. However, where the connecting evidence "shows no more than an opportunity to commit a crime, simply proves suspicion, or is equally consonant with a reasonable explanation pointing toward innocent conduct on the part of the defendant, the evidence is to be deemed insufficient." Mitchell, 625 P.2d at 1158. State v. Shurtliff (1980), 187 Mont. 235, 609 P.2d 303.

Apart from Johnson's testimony, the State showed that defendant gave inconsistent statements about what happened during the commission of the homicide. Initially, she told Officer Magnuson that after she was hit by one of the men, she willingly removed her rings and gave them to him. Defendant stated that she was hit once more and then closed the bathroom door where she remained until the men left. However, defendant told Officer Stevens a different story. She claimed that when the man asked for her rings she refused. The man forcibly removed the rings from her fingers. He hit her five times and she lost consciousness. Defendant's inconsistent statements suggest that she fabricated the story.

Secondly, as defendant was relating her statement to Officer Stevens, she pulled back her gown to reveal the bruises to her chest. She did not do this in response to any question asked by Officer Stevens. Furthermore, upon examination at the hospital, Dr. Booth concluded that the bruises were several days old and could not have been sustained

11

during the alleged burglary. Dr. Booth made the same conclusion as to the abrasions to defendant's nose. He did not find any injuries to her fingers indicating that defendant's rings had been forcibly removed. Dr. Booth did not find any injury of recent origin. Therefore, it is obvious that defendant was lying when she told the police that she had been hit by one of the men. Defendant had not been hit anywhere during the crime.

Additionally, defendant's rings were found in the pocket of Melvin Wendell subsequent to the crime. The victim's rings were never found. This fact tends to connect defendant with the conspiracy to kill her husband.

The evidence sufficiently corroborates defendant with the commission of the offense. Defendant stated that she was hit repeatedly until she lost consciousness. However, defendant suffered no injuries during the commission of a very violent crime. She voluntarily showed Officer Stevens her bruises in an effort to make her story more believable. At trial defendant offered no explanation concerning this damaging evidence.

As the Court observed in Shurtliff, 609 P.2d at 306:

> There can be no question that defendant could not have been convicted without Johnson's testimony; but this fact does not establish that the corroborating proof was insufficient.

Although the connecting evidence would not have been sufficient, standing by itself, to convict defendant, it clearly corroborated Dan Johnson's testimony.

Defendant's fourth issue concerns insufficiency of the evidence to support the verdict. The standard of review for questions involving sufficiency of the evidence to support a conviction is: (1) questions of fact must be determined solely by the jury, and (2) once a certain legal minimum of

12

evidence has been presented, this Court will not make an independent determination of guilt and and substitute its judgment for that of the jury. State v. Lemmon (Mont. 1984), 692 P.2d 455, 41 St.Rep. 2359; State v. Martinez (Mont. 1980), 613 P.2d 974, 37 St.Rep. 982.

There is no question that substantial evidence existed to support the jury's finding. Dan Johnson testified that as he and Melvin Wendell entered defendant's motel room, he saw defendant walk calmly past him and go into the bathroom. She remained there until the two men were ready to leave. Immediately prior to their leaving, defendant told Wendell, "you better take these," and she handed him her rings. Johnson's testimony is corroborated by the fact that defendant sustained no physical injuries during the incident and by the fact that she lied to police officers that she was beaten during the incident. It is our task to determine whether the State presented sufficient evidence which would allow the jury to find defendant guilty beyond a reasonable doubt. Upon a review of all the evidence presented, we find that the State met its burden.

Prior to trial, defendant filed a motion in limine for the stated purpose of prohibiting the State from introducing, through the testimony of Dan Johnson, any statements by Wirtala to the effect that defendant said she agreed with or wanted to procure her husband's death. The basis of the motion was that these statements were inadmissible hearsay and would violate defendant's right to confront the witnesses against her. The motion was denied, and defendant raises the same argument on appeal.

In determining whether or not the statements objected to were inadmissible hearsay, we must first decide whether the statements constitute hearsay. Hearsay is defined as "a statement, other than one made by the declarant while

13

testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." A statement is defined as "an oral or written assertion . . ." and a declarant is the person who makes a statement. Rule 801, Mont.R.Evid.

The only arguable testimony falling within defendant's motion in limine and objection is the following:

> Q. I don't want to know what Melvin told you yet, Dan. I'm just asking after your conversation with Melvin, you obviously understood what the plan was going to be; would that be right?
>
> A. Okay.
>
> Q. And what was the plan?
>
> A. I was supposed to burglarize the place.
>
> Q. And that's it?
>
> A. And John and Corky were going to kill Maurice.

It is apparent from this testimony that Johnson did not testify to any statements made to him by Wendell or Wirtala. He testified only to his understanding of the plan.

It is a fundamental rule that a necessary ingredient of hearsay is a statement by a declarant. Because Johnson did not testify to any statements made to him by Wendell or Wirtala, there was no hearsay. Although defendant might have raised another objection to this testimony which would have been proper, no error can be claimed on the basis of hearsay.

This Court has previously considered this same issue in State v. Canon (Mont. 1984), 687 P.2d 705, 41 St.Rep. 1659. In Canon, a detective testified that a certain conversation was taped with the consent of one Lois Ruland. The defendant objected to this testimony as hearsay. The Court held that

14

because the detective had not testified as to any statement made by Ruland, the testimony was not hearsay. Following Canon, we hold that the testimony objected to by defendant was not hearsay. No error can be predicated on this basis.

In her sixth issue, defendant contends that the court erred in not granting Melvin Wendell immunity so he could be compelled to testify. Since Wendell's testimony was crucial to defendant's case, the court's ruling prevented her from having a fair trial and presenting a full defense.

It is unnecessary for us to consider this issue for the reason that defendant did not make a proper offer of proof following the court's ruling. Rule 103, Mont.R.Evid., provides in part:

> Error may not be predicated upon a
> ruling which admits or excludes evidence
> unless a substantial right of the party
> is affected, and
>
> . . .
>
> (2) Offer of proof. In case the ruling
> is one excluding evidence, the substance
> of the evidence was made known to the
> court by offer or was apparent from the
> context within which questions were
> asked.

Since defendant failed to inform the court as to what Wendell would probably testify to or as to what she hoped to show through Wendell's testimony, she is precluded from claiming that the court's ruling was in error.

Defendant contends in her seventh issue that the introduction into evidence of the photographs of her face and left chest, taken during her examination at the hospital, was error. Defendant does not cite any facts which indicate that the photographs prejudiced her in anyway. She merely argues that the photographs resulted in needless embarrassment. We

find that the admission of the photographs into evidence did not affect the substantial rights of defendant and does not provide any basis to set aside the verdict.

Defendant next argues that the prosecution misrepresented the immunity statute to the court in an effort to prevent Melvin Wendell from testifying, which amounted to a suppression of evidence. The record indicates that during a discussion in chambers about the effect of granting Wendell immunity, the State incorrectly argued that Wendell would have to be granted immunity for any matter related to the offense at issue. Although this was a correct statement of the law prior to October 1, 1983, the statute was amended to abolish mandatory "transactional immunity." Section 46-15-311, MCA (1983). Thus, the prosecutor was incorrect in his argument on the immunity statute. However, a defendant is required to show more than a simple inadvertent misstatement of the law by the prosecutor to establish a claim of prosecutorial misconduct.

Misconduct implies that there was some knowing, bad faith scheme or action by a prosecutor for the purpose of gaining an unfair advantage over the defendant. An innocent misstatement of the law by a prosecutor does not rise to this level. Defendant's argument might have some merit if she were able to present any facts which indicated that the prosecutor deliberately misrepresented the immunity statute in an effort to persuade the court to keep Wendell off the stand. However, defendant's argument is based on nothing but speculation. The prosecutor's good faith can easily be seen by the simple fact that neither defendant's counsel nor the court seemed to be aware of amendment either. In other words, it was the kind of oversight that could be made by any

16

person. We cannot reasonably expect prosecutors to be infallible in their knowledge of the law.

In her ninth issue, defendant contends that the court committed cumulative error during the trial which resulted in the denial of her right to a fair trial. Since we have found that no errors were committed by the court, this issue is without merit.

Finally, defendant contends that Instruction No. 18 was prejudicial. Instruction 18 stated that the jury could considered, as consciousness of guilt, "any testimony showing, or tending to show, concealment or destruction of evidence by defendant." The basis of defendant's argument is that the instruction was not supported by the evidence. We disagree with this contention.

Testimony at trial established that Wendell burned his sweater in one of the fireplaces in defendant's home. Testimony further established that defendant suddenly cleaned the fireplaces, but cleaned no other room in the house. The evidence provided a sufficient basis for the instruction. The instruction aided the jury in assessing the probative value of such evidence, if found believable. State v. Walker (1966), 419 P.2d 300, 306, 148 Mont. 216, 226. The court did not err in giving this instruction.

For the reasons stated above, the judgment is affirmed.

_____
Chief Justice

We concur:

_John Conway Harrison_

_[signature]_

_L. C. Gulbrandson,_

_John C. Sheehy_

_[signature]_

_William E. Hunt Sr._
Justices

18