No. 94-155

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995

STATE OF MONTANA,

    Plaintiff and Respondent,

    -v-

STUART STRINGER,

    Defendant and Appellant.



FILED

JUN 14 1995

Ed Smith

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable John Warner, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

            William F. Hooks, Appellate Defender Office, Helena,
Montana; Nathan J. Hoines, Great Falls, Montana

        For Respondent:

            Joseph P. Mazurek, Attorney General, Jennifer
Anders, Assistant Attorney General, Helena, Montana;
Patrick L. Paul Cascade County Attorney, Great
Falls, Montana

Submitted on Briefs:   January 26, 1995

Decided:   June 14, 1995

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

Appellant Stuart Stringer was charged by Information with one count of aggravated burglary, a felony in violation of § 45-6-204(2)(a), MCA, one count of aggravated kidnapping, a felony in violation of § 45-5-303(1)(c), MCA, and two counts of assault in violation of § 45-5-202(2)(a) and (b), MCA. A jury trial was held in the Eighth Judicial District Court, Cascade County on November 8-10, 1993. The court dismissed the aggravated burglary count at the conclusion of the State's case-in-chief, and the jury acquitted Stringer on one of the felony assault charges. Stringer was convicted of the charges of aggravated kidnapping and one count of assault. After sentencing, the District Court entered judgment against Stringer, who appeals from this judgment. We reverse and remand.

Stringer raises four issues on appeal:

1. Whether the District Court erred in permitting testimony concerning the battered woman syndrome?

2. Whether the prosecutor engaged in misconduct?

3. Whether there was sufficient evidence to sustain the convictions?

4. Whether the District Court erred in refusing to examine a juror, or to grant relief after being informed that a juror may have concealed material information during voir dire thus raising the possibility of bias and partiality?

BACKGROUND FACTS

Stuart and Kathy Stringer had recently divorced prior to the incidents giving rise to the charges against Stuart. At the time the incidents took place, Kathy was living in a basement apartment

2

with the Stringer's two daughters, A.S. and I.S.  The couple's three sons were living with Stuart.  Kathy and Stuart remarried shortly after the events occurred.

On April 24, 1993, Kathy and a friend, Ray Rogers, went to a party at a house belonging to Bob and Cheryl Dumas.  According to the testimony of Kathy, Ray and Bob, the partygoers spent the evening consuming a great quantity of whiskey and beer, talking, and playing video games.  During the course of the night, they all became extremely intoxicated.

Kathy spent the night at the Dumas' house, and upon awakening at approximately 5:00 or 6:00 a.m., she drank some more whiskey.  The next thing Kathy remembers is being awakened by her ex-husband Stuart.  At this time Kathy was in bed with Ray who had also spent the night at the Dumas' house.

In a written statement given to the Great Falls police on April 26, 1993, Kathy described what transpired next:

> At about 9:30 a.m., I was in bed at Robert Dumas['] house at #17 Fisher Trailer Park and was awaken[ed] by Stuart Stringer, my ex[-]husband with a gun pointed in my face and Ray Rogers['] face.  Stuart said wake up Ray and Kathy you . . bitch, I'm going to kill you.  I am foggy about the rest but to the best of my knowledge, Robert Dumas came in front of the gun and told Stuart no, not in my house Stuart.  Stuart took off.  I got dressed and Ray took me to my house.  I went and got something to eat at Taco Treat and then went home and went to sleep.

However, Kathy's, Ray's and Robert's trial testimony was considerably different from Kathy's written statement.  All three testified that Stuart had awakened Kathy and Ray who were in bed together, and that Kathy and Stuart argued and exchanged profanities.  Kathy testified that she did not remember if Stuart

3

had a gun with him, but was certain that he did not point a gun at her or threaten her. Ray testified that Stuart did not threaten to kill Kathy or Ray, and that he was certain Stuart did not have a gun. Robert testified that Stuart had a gun which was in a holster which was tucked into his pants. According to Robert, the holstered gun began to slip out of Stuart's pants while he and Kathy were arguing, and Stuart grabbed it and placed it back into his pants before it fell. The argument ended when Robert interceded and asked both Kathy and Stuart to leave.

Later that evening, Stuart went to Ray's apartment and asked Ray to accompany him to Kathy's apartment because he wanted to talk to her and needed a "witness." Ray agreed to accompany Stuart, and the two men walked to Kathy's apartment. That evening, at the request of the police, Kathy wrote the following statement regarding what transpired upon Stuart's arrival:

> About 11:15 p.m. I was being pulled out of bed by my hair by Stuart. [H]e threw me against the wall and started to stab at me with his pocket knife. Glenda, the lady upstairs yelled at Stuart and told Stuart to leave. She called 911 - Stuart made me come out with him and Ray Rogers and walk to talk - he kept slashing out at me with the knife. He made Ray and me walk down the alley to 15th St. and he kept on telling Ray and I he was going to kill all of us including himself. He kept on slaping [sic] me up in my mouth and pushing Ray and making me tell him I was going to come back home and how I know I love him and how I was causing problems with him and Ray and how I am and will belong to him. Also he had Ray scared to death. We walked back home and police were there and arrested him.

At trial, Kathy gave a different version of the events occurring that night and testified that the statement she wrote was false. Kathy stated that she wrote a false statement because she

was still intoxicated and embarrassed at having been caught in bed with Ray. Kathy then stated that on the night of April 25, 1993, she was lying in bed holding a pocket knife and contemplating suicide by cutting her wrists. Stuart came in to her room and attempted to take the knife. The two struggled with the knife and Kathy testified that she, and maybe Stuart, received cuts. Kathy then stated that she went for a walk voluntarily with Stuart so that they could talk.

Kathy mentioned at trial that Stuart was always welcome at her house, and that she voluntarily went on a walk with Stuart and Ray in an attempt to "work things out." She also stated that Stuart did not threaten to kill her or Ray during the walk and that neither she nor Ray were afraid of Stuart at this time.

Great Falls Police Officers Carey Tamborino and John Catlett were dispatched to the scene that night as a result of a 911 call. Officer Tamborino testified that upon arriving at Kathy's apartment, he met Glenda King, Kathy's landlady who lived upstairs from Kathy. Glenda explained to Officer Tamborino that Stuart had come to the residence and that she had told Stuart that she did not want him in the house. According to officer Tamborino, Glenda stated that Stuart had a knife, and walked down the stairs to Kathy's apartment and left blood on the railing. She reported that she heard Stuart shout, "you're going to die with me here if you don't come with me." Glenda also told Officer Tamborino that she heard a struggle and then saw Kathy, Stuart, and Ray leave the apartment.

Officer Tamborino also spoke with A.S. and I.S., Stuart and Kathy's daughters, that night at the scene. A.S. told him that her dad was angry about the recent divorce and that when he arrived that evening she believed he was drunk. A.S. related that Stuart went downstairs, struggled with Kathy and took her out of the apartment at knife point, and stated that he might kill her. Officer Tamborino stated that I.S. appeared to be hysterical, that she was crying and saying "he's going to kill her."

Shortly thereafter, Kathy, Stuart and Ray returned to the apartment. Officer Tamborino observed that Kathy had a cut on her wrist, and on her lip. Officer Catlett patted Stuart down, but found no weapons on him. He then placed Stuart under arrest and transported him to the county jail.

Officer Tamborino questioned Ray about the incident. According to Tamborino's report which he wrote up at the end of his shift, Ray told him that Stuart had come to his apartment that night and asked him to accompany him to Kathy's apartment. When asked why Stuart had made this request, Ray related that Stuart had said "I'm afraid I'm going to kill her." Ray also indicated that he was afraid of Stuart, and that Stuart had been brandishing a handgun earlier in the day.

At trial, A.S., Ray, and Glenda King gave testimony which was contradictory to the statements they had given to Officers Tamborino and Catlett. Their testimony at trial tended to demonstrate that Stuart did not commit the crimes charged.

Prior to trial, the State gave notice of its intention to call

6

Shirley LaRocque, a client advocate for a Great Falls' battered woman's shelter, as an expert witness. The purpose of Ms. LaRocque's testimony was to explain the battered woman syndrome and its effect on spouses and children.

On the first day of trial, the defense moved to exclude any prior acts evidence regarding Stuart's prior criminal history and domestic abuse charges, including testimony from Ms. LaRocque concerning prior abuse between Stuart and Kathy on the basis that no Just notice had been given. The court acknowledged that because the testimony would involve explaining a cycle of abuse, it raised Just notice requirements. However, the court allowed Ms. LaRocque to testify, on the condition that she not testify to any prior acts of abuse. Ms. LaRocque testified concerning the cycle of domestic abuse, and explained that it is not uncommon for a battered woman to recant or change her story at the time of trial.

The court dismissed the aggravated burglary charge at the end of the State's case, on the grounds that there was insufficient evidence. The jury convicted Stuart of two of the charges: (1) aggravated kidnapping; and (2) assault. The jury found Stuart not guilty of the second assault charge. Additional facts will be presented as are necessary for discussion of the issues.

## 1. EXPERT TESTIMONY

The first issue Stuart raises on appeal is that evidence of the battered woman syndrome is not admissible because it was offered to bolster Kathy's credibility. Stuart also attacks the admissibility of battered woman syndrome evidence on several other

7

grounds. However, we shall limit our discussion to the above mentioned argument as it is dispositive.

Standard of Review

Rulings on the admissibility of evidence are left to the sound discretion of the trial court. Mason v. Ditzel (1992), 255 Mont. 364, 370-71, 842 P.2d 707, 712. We review a district court's evidentiary rulings to determine whether the court abused its discretion. State v. Gollehon (1993), 262 Mont. 293, 301, 864 P.2d 1257, 1263.

Use of Battered Woman Syndrome Evidence.

Parties have generally sought to introduce evidence concerning the battered woman syndrome for two purposes: (1) as an affirmative defense of justifiable use of force in a criminal trial, See State v. Kelly (N.J. 1984), 478 A.2d 364; or (2) to provide a possible explanation for the abuse victim's recantation and to impeach her subsequent testimony that she had lied in her original statement. See State v. Borrelli (Conn. 1993), 629 A.2d 1105. This Court has never directly ruled on whether evidence of the syndrome can be used as an affirmative defense, but we have recognized that this evidence has been used in other jurisdictions. State v. Hess (1992), 252 Mont. 205, 828 P.2d 382. In addition, while we have never directly ruled on whether it is permissible to allow expert testimony to explain why an abused woman might recant earlier statements at a criminal trial against her abuser, we have held that it was impermissible to offer testimony concerning the battered woman syndrome to bolster a female defendant's

8

credibility. State v. Dannels (1987), 226 Mont. 80, 734 P.2d 188. In Dannels, we also acknowledged that battered woman syndrome evidence can be used to prove that a criminal defendant did not have the requisite state of mind to commit the crime. Dannels, 734 P.2d at 192. Therefore, this case presents the first opportunity for us to decide whether battered woman syndrome evidence can be used by the prosecution in a criminal trial to impeach the complaining witness' trial testimony, and to explain why a witness recants earlier statements at trial.

Testimony used to bolster victim's credibility.

Relying on Dannels, Stuart argues that a person may not bolster his or her credibility and explain inconsistent statements were made because he or she suffered from the battered woman syndrome. In Dannels, the defendant was charged with deliberate homicide in connection with the death of her husband. When the police questioned her about the incident, Dannels told the police that she received the bruises during the course of an attack by robbers who broke into their motel room, assaulted her, and killed her husband. However, later examination by a physician revealed that the bruises were old injuries and could not have been sustained on the night in question. Dannels, 734 P.2d at 191. At trial, Dannels sought to introduce evidence concerning the battered woman syndrome to explain why she lied to the police about the origin of her bruises. This Court acknowledged that such evidence could be used to prove that the defendant did not have the requisite state of mind to commit the offense in accordance with §

9

46-14-102, MCA.   However, we held that the evidence was inadmissible because it was being offered for the purpose of bolstering the defendant's credibility.  Dannels, 734 P.2d at 192-93.

However, the purpose for which evidence of the syndrome was sought to be introduced in Dannels is distinguishable.  In Dannels, the criminal defendant sought to introduce evidence of the battered woman's syndrome to bolster her credibility.  She did not offer the evidence in support of her own self defense theory.  In the instant case, the evidence was offered by the prosecution, to provide an understanding as to why the complaining witness might recant her earlier statement that she suffered abuse at the hands of her spouse.  The overwhelming trend of other jurisdictions is to allow evidence regarding the battered woman syndrome.  Expert testimony concerning battered woman syndrome is accepted in at least thirty-one states.  Bechtel v. State (Okl.Cr. 1992), 840 P.2d 1, 7.

The "battered woman syndrome" is the term used to define the "common characteristics that appear in women who are abused physically and psychologically over an extended period of time by the dominant male figure in their lives."  Kelly, 478 A.2d at 371.  Because the average juror might not have experience or knowledge about the battered woman syndrome, expert testimony is used to explain recantation by the complaining witness.

The relevance of battered woman syndrome evidence has been aptly described as follows:

> A battered woman may act in ways that are incomprehensible to the average person.  She may tolerate

10

physical abuse for years, hide her abuse, delay reporting even severe abuse to authorities or friends, or recant and attempt to have charges against her abuser dropped. Consequently, when the state's key witness, the battered woman, testifies against her batterer, she may appear to be fabricating her story. If the jury does not understand why the woman behaved in this manner, it will be unable to assess the evidence correctly. Thus, when a batterer is prosecuted, the state needs expert testimony to educate the jury about battered women in order to enable the jury to determine the facts in issue. (Footnotes omitted.)

Schroeder, Using Battered Woman Syndrome Evidence in the Prosecution of a Batterer, 76 Iowa L. Rev. 553 (1991).

Jurisdictions which have approved battered woman syndrome evidence to explain a victim's recantations do so on the basis that the expert's testimony would provide a reasonable explanation for the victim's recantation. State v. Bednarz (Wis.Ct.App. 1993), 507 N.W.2d 168; State v. Borrelli (Conn. 1993), 629 A.2d 1105; Arcoren v. U.S. (8th Cir. 1991), 929 F.2d 1235. In Bednarz, the Wisconsin Court of Appeals explained:

The battered woman's syndrome is recognized as a subcategory of posttraumatic stress disorder. While there are various possible explanations for [the victim's] recantation, one explanation could be that the recantation is consistent with this form of posttraumatic stress disorder. An untrained lay person does not know that recantation can be suggestive of posttraumatic stress in the form of the battered woman's syndrome. The expert opinion was thus permissible to enlighten the jury and allow it to intelligently consider the syndrome as one possible explanation for [the victim's] behavior.

Bednarz, 507 N.W.2d at 172; see also, State v. Riker (Wash. 1994), 869 P.2d 43, 47 "[the battered woman syndrome] is considered a subset of post-traumatic stress disorder. . . . "

Expert testimony in Montana is governed by Rule 702, M.R.Evid., which provides:

11

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Here, Stuart is not contesting the general admissibility of evidence regarding the battered woman syndrome, rather, he asserts that it cannot be used to bolster a witness' credibility. It is well established that an expert cannot be allowed to comment on the credibility of an alleged victim. State v. Harris (1991), 247 Mont. 405, 409-10, 808 P.2d 453, 455; State v. Brodniak (1986), 221 Mont. 212, 222, 718 P.2d 322, 329. The reason for this rule is that the question of credibility lies within the province of the jury, and expert testimony regarding credibility invades the jury's function by placing a "stamp of scientific legitimacy" on the victim's allegations. Harris, 808 P.2d at 455.

However, in this case, the evidence was not offered to bolster Kathy's testimony, but to provide the jury with an explanation for the inconsistencies in her testimony. Furthermore, the expert did not comment as to which of Kathy's statements were more credible or offer an opinion on whether Kathy is a battered spouse. Rather, she merely provided the jury with information to aid the jury in evaluating the evidence. This type of limited testimony does not invade the jury's role in determining the credibility of witnesses. Arcoren, 929 F.2d at 1241.

While we hold that expert testimony on battered woman syndrome should generally be admissible, in this case, the State failed to lay an appropriate foundation establishing that Kathy was a

12

battered spouse. Therefore, testimony about how battered women act was irrelevant and should not have been admitted.

Dr. Lenore Walker, a psychologist who was preeminent in developing the battered woman syndrome, explains in her book, <u>The Battered Woman</u> (1979)[1], that the violence inherent in a battering relationship is not random, but follows an identifiable cycle. The battering cycle has "three distinct phases": the tension building phase; the explosion or acute battering phase; and the calm, loving respite (often called the honeymoon phase). During the first phase, minor battering incidents may occur. The woman attempts to minimize the incidents and calm the batterer to prevent the violence from escalating. As tension increases, it becomes more difficult for the coping techniques to work, which escalates into the second stage, the battering incident. This stage is characterized by the uncontrollable nature of the abuse (injury, brutality and sometimes death). The battering incident is followed by the third phase where the couple makes up. During this phase, the batterer exhibits loving and caring behavior and typically begs for forgiveness and promises the battering will never happen again. Lenore E. Walker, <u>The Battered Woman</u> 56-70 (1979). Dr. Walker also explains that "in order to be classified as a battered woman, the couple must go through the battering cycle at least twice. Any woman may find herself in an abusive relationship with a man once." Lenore E. Walker, <u>The Battered Woman</u> xv (1979).

Many jurisdictions considering the admissibility of expert

---

[1]. Harper & Row Publishers.

testimony on the battered woman syndrome require proof that the witness was the victim of two cycles of abuse. See for example State v. Koss (Ohio 1990), 551 N.E.2d 970; State v. Borrelli (Conn. 1993), 629 A.2d 1105; Bechtel v. State (1992),(Okl.Cr. 1992), 840 P.2d 1. It follows then that there first must be evidence of a battered victim before expert testimony on the syndrome may be admitted. Koss, 551 N.E.2d at 974, "a defendant attempting to admit expert testimony regarding the battered woman syndrome must offer evidence which establishes herself as a 'battered woman."' See also Borrelli, 629 A.2d at 1115 n.15.

While we decline to set hard and fast foundational requirements, preferring instead, to leave those to the sound discretion of the trial court on a case by case basis, the party seeking to introduce battered woman syndrome evidence must lay an appropriate foundation substantiating that the conduct and behavior of the witness is consistent with the generally recognized symptoms of the battered woman syndrome, and that the witness has behaved in such a manner that the jury would be aided by expert testimony which provides a possible explanation for the behavior. It also is important to re-emphasize that the expert may not testify to or comment upon the credibility of the witness.

Since the evidentiary foundation will likely involve offering other acts evidence showing prior completed cycles of abuse, counsel seeking to introduce battered spouse syndrome evidence must file the appropriate notice according to State v. Just (1979), 184 Mont. 262, 602 P.2d 957, as modified in State v. Matt (1991), 249

14

Mont. 136, 814 P.2d 52. If the court determines that the proffered other acts evidence is not admissible under the tests established in Just and Matt, the court may nevertheless, hear the foundation testimony outside the presence of the jury and appropriately limit the testimony presented to the jury.

In the instant case, the State did not file a modified Just notice, and was therefore precluded from offering other acts testimony. Moreover, at trial, the State failed to demonstrate that Kathy was the victim of prior cycles of abuse. Accordingly, we hold that the expert's testimony should have been excluded because the State failed to lay an appropriate foundation for the expert's testimony by establishing or offering any evidence that Kathy was a battered spouse.

## 2. PROSECUTORIAL MISCONDUCT

Stuart contends that the prosecutor engaged in misconduct when, during closing argument, the prosecutor characterized the witnesses favorable to the accused as liars, asserted his personal opinion on Stuart's guilt, referred to matters not in evidence, and insinuated that defense counsel was keeping vital information probative of guilt from the jury. Stuart asserts that the prosecutor's misconduct denied him his right to a fair trial as guaranteed by the Sixth Amendment of the United States Constitution and Article II, Section 24, of the Montana Constitution. We agree.

We initially note that in each instance of alleged misconduct, defense counsel objected to the prosecutor's statements, and therefore, Stuart meets the contemporaneous objection rule at § 46-

15

20-104(2), MCA.

Stuart asserts that the first instance of prosecutorial misconduct occurred when the prosecution characterized Kathy and the Stringer children as liars during his initial closing argument. The prosecutor stated:

> A domestic situation should be an environment where there's nurturing between the spouses and children, where there's love, where there's trust, where there's things being done in caring for each other.
>
> But what do we see in this particular case? We see a family that's ripped apart. We see a wife that's willing to lie, be embarrassed, blame herself for the defendant's acts.
>
> We see children that are taught to lie and despise authority. We see friends who are asked to lie. .
>
> We see children that live in a constant state of hysteria. It's no wonder that two of them are in the psych ward at the hospital as we talked today. It's no wonder that another is in a special program at --

According to Stuart, the second incident of misconduct occurred when the prosecutor expressed his personal opinion and belief that Stuart was guilty of the crimes charged when he stated in rebuttal closing argument:

> Mr. Stringer is the defendant. He's is one [sic] that's charged. He's the one that committed the crimes.
> I have a strong belief in this case that these crimes were committed.

Finally Stuart argues that the prosecution insinuated that the defense had suppressed information relative to guilt when the prosecution stated:

> What the defense hasn't disclosed to you is that -- he talked about probable cause. They talked about reasonable doubt. They talked about burden of proof. They don't disclose to you what's necessary for us to bring these charges: The affidavit of probable cause,

16

approval of the Court, motions to dismiss by them, rulings by the Court.

This Court has stated repeatedly that it is highly improper to characterize either the accused or the witnesses as liars or offer personal opinions as to credibility. State v. Arlington (1994), 265 Mont. 127, 157, 875 P.2d 307, 325; State v. Rodgers (1993), 257 Mont. 413, 417, 849 P.2d 1028, 1031; State v. Musgrove (1978), 178 Mont. 162, 172, 582 P.2d 1246, 1252-53. In addition, we have recognized that the Rules of Professional Ethics prohibit a lawyer from asserting personal opinions as to the credibility of a witness, or the guilt or innocence of the accused. State v. Stewart (1992), 253 Mont. 475, 482-83, 833 P.2d 1085, 1089-90; Musgrove, 582 P.2d at 1252-53.

The State contends that the prosecutor did not give a personal opinion regarding the witnesses' credibility, but was merely commenting on evidence that Kathy and other witnesses had changed their stories from the time they had originally talked to the police. While a prosecutor may point out and comment on contradictions and conflicts in testimony, "[i]t was the task of the jury to determine which testimony and evidence was more believable." Stewart, 833 P.2d at 1090. We are not suggesting that it is reversible error every time counsel mentions the word "lie" in closing argument. However, in this case, the prosecutor commented so directly on the credibility of the witnesses, and called them liars in so blunt a manner that we cannot conclude that he was merely commenting on or pointing up inconsistencies in the testimony.

17

It was also improper for the prosecutor to suggest that the trial court had already made findings indicative of guilt and that defense counsel had kept these findings from the jury. By referring to the "affidavit of probable cause" and rulings by the court concerning motions to dismiss, the prosecution not only commented on evidence which was not in the record, but implied that the court had approved the charges and passed judgment on Stuart's guilt.

The reasons why prosecutorial comments about the guilt of an accused are improper have been set forth at length in State v. Campbell (1990), 241 Mont. 323, 328-29, 787 P.2d 329, 332-33. Among the reasons are that: (1) a prosecutor's expression of guilt invades the province of the jury and is an usurpation of its function to declare the guilt or innocence of an accused; (2) the jury may simply adopt the prosecutor's views instead of exercising their own independent judgment as to the conclusions to be drawn from the testimony; and (3) the prosecutor's personal views inject into the case irrelevant and inadmissible matters or a fact not legally proved by the evidence, and add to the probative force of the testimony adduced at the trial the weight of the prosecutors' personal, professional, or official influence.

This Court has been unequivocal in its admonitions to prosecutors to stop improper comment and we have made it clear that we will reverse a case where counsel invades the province of the jury by characterizing a party or witness as a liar, or his testimony as lies. Arlington, 875 P.2d at 325. After considering

18

the prosector's closing and rebuttal arguments in full, we hold that Stuart was prejudiced by the prosecutor's improper comments.

### 3. INSUFFICIENT EVIDENCE

At the close of the State's case-in-chief, Stuart moved for a directed verdict on the basis that there was insufficient evidence to support a finding or verdict of guilty. The trial court agreed that there was insufficient evidence to support the aggravated burglary charge and dismissed that charge, and the remaining three charges went to the jury. The jury found Stuart guilty of two of the remaining three charges, felony assault and aggravated kidnapping. Stuart contends that the District Court erred in denying his motion for a directed verdict because the only proof of these crimes was Kathy's prior written inconsistent statement.

Section 46-16-403, MCA, allows a trial court to dismiss a criminal action at the close of the prosecution's case-in-chief, when the evidence is insufficient to support a finding or verdict of guilty. An accused is entitled to an acquittal "if reasonable persons could not conclude from the evidence taken in a light most favorable to the prosecution that guilt has been proven beyond a reasonable doubt." State v. Mummy (1994), 264 Mont. 272, 276, 871 P.2d 868, 870. The decision to direct a verdict lies within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. Mummy, 871 P.2d at 870.

According to Rule 801(d)(1)(A), M.R.Evid., prior inconsistent statements are not hearsay, and thus are admissible as substantive evidence if:

19

> The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony .

See also, State v. Fitzpatrick (1980), 186 Mont. 187, 606 P.2d 1343, cert. denied, 499 U.S. 891, 101 S.Ct. 252, 66 L.Ed.2d 118.

However, in State v. White Water (1981), 194 Mont. 85, 88, 634 P.2d 636, 638, we held that an "unreliable prior inconsistent statement should not be the sole, substantive evidence" in a criminal conviction. While a prior inconsistent statement standing alone is insufficient to sustain a conviction, a prior inconsistent statement which is corroborated by other circumstantial evidence may suffice. State v. Pinkerton (1995), 891 P.2d 532, 535, 52 St.Rep. 186, 188.

In the instant case, we conclude that the circumstances under which Kathy's prior inconsistent statements were given were not unreliable. The statements were written out and signed by her on April 25, 1993, shortly after incidents occurred. Although Kathy had been drinking heavily on April 24, 1993, both officers Tamborino and Catlett testified that Kathy did not appear to be intoxicated. In addition, Kathy's statements were supported by other circumstantial evidence: (1) Kathy had cuts, scrapes and bruises on her body which were photographed by officer Catlett and introduced at trial; (2) the officer's testimony regarding I.S's hysterical appearance and statement, "he's going to kill her" which they observed shortly after arriving at the scene; (3) the fact that Kathy had left for a walk at 11:00 at night without wearing a coat or socks; and (4) the officer's testimony that the statements

20

of A.S., Glenda King, and Ray Rogers, taken that night at the scene, were consistent with one another.

Construing the evidence in a light most favorable to the prosecution, we conclude that the evidence was sufficient to withstand a motion for a directed verdict and hold that the District Court properly denied Stuart's motion.

## 4. JUROR MISCONDUCT

After voir dire had been completed and the jury had been sworn, but before any witnesses were called, defense counsel advised the trial court that Kathy had told him that she knew one of the jurors, D.M.. In chambers, counsel related that there had been problems between Kathy, D.M., and D.M.'s daughter. Defense counsel asked the court to talk to the juror, to determine if the juror did in fact know Kathy, and if so, whether she would be prejudiced against Stuart because of this fact. The court declined to interview D.M., concluding that since she did not mention that she knew Kathy when asked this during voir dire, "we must assume that . although Mrs. Stringer or some witness may know this lady, this lady doesn't really know them to that degree." Defense counsel then asked if he could make an offer of proof, which the court denied.

Article II, Section 24 of the Montana Constitution and the Sixth Amendment to the United States Constitution, each guarantee a criminal defendant the right to a fair and impartial jury. A juror's nondisclosure of information requested, may constitute misconduct and a denial of the accused's right to a fair and

21

impartial jury if juror's nondisclosure amounts to "intentional concealment."  State v. Bauer (1984), 210 Mont. 298, 310, 683 P.2d 946, 953.

The State claims that the defense failed to demonstrate intentional concealment even though it had the opportunity to do so at the post-trial hearing on the defense's motion for a new trial. However, we indicated in State v. Eagan (1978), 178 Mont. 67, 78, 582 P.2d 1195, 1201, and in State v. Baugh (1977), 174 Mont. 456, 571 P.2d 779, when during trial, the court is informed of misconduct, the juror should be interviewed by the court, and the court should inquire of the panel before the verdict is announced if the misconduct tainted the panel. Here, the District Court had the opportunity to question the juror, at the time the issue was brought before it, but chose not to do so.

In making its decision, the court relied on an assumption that although Kathy Stringer may know the juror, "this lady [the juror] doesn't really know them to that degree." The court's assumption was without factual basis, and the court should have interviewed the juror to determine if there was prejudice.

> It is the rule in this state that if jury misconduct is shown tending to injure the defendant, prejudice to the defendant is presumed; however, the presumption is not absolute and may be rebutted by the use of testimony of the jurors to show facts which prove that prejudice or injury did not or could not occur.

State v. Eagan (1978), 178 Mont. 67, 79, 582 P.2d 1195, 1202, citing State v. Jackson (1890), 9 Mont. 508, 522, 24 P. 213, 216; Putro v. Baker and Mannix Electric, Inc. (1966), 147 Mont. 139, 147, 410 P.2d 717, 722. The court's assumption as to the juror's

22

state of mind or knowledge was not a valid basis to reject the prejudice inherent in the circumstances.  We hold that the court's failure to investigate the matter at the **time** it was brought to its attention by defense counsel was error.

Reversed and remanded for further proceedings consistent with this opinion

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

.

June 14, 1995

CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

WILLIAM F. HOOKS
Appellate Defender Office
P.O. Box 200145
Helena, MT 59620-0145


NATHAN J. HOINES
Attorney at Law
600 Central Plaza, Suite 316
Great Falls, MT 59401

HON. JOSEPH P. MAZUREK, Attorney General
Jennifer Anders, Assistant
Justice Bldg.
Helena, MT 59620

Sue Weber
County Attorney
Cascade County Courthouse
Great Falls, MT '59401

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
Deputy