DA 09-0311

IN THE SUPREME COURT OF THE STATE OF MONTANA

2010 MT 224

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

CARL MELVIN ANKENY,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Third Judicial District,
In and For the County of Deer Lodge, Cause No. DC 08-40
Honorable Ray J. Dayton, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Nancy G. Schwartz, NG Schwartz Law, PLLC, Billings, Montana

      For Appellee:

          Steve Bullock, Montana Attorney General; Jonathan M. Krauss, Assistant
Attorney General, Helena, Montana

          Joan Borneman, Deer Lodge County Attorney; Susan Callaghan, Deputy
County Attorney, Anaconda, Montana

Submitted on Briefs:  August 4, 2010

Decided:  October 26, 2010

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1     Carl Ankeny appeals his conviction in the District Court for the Third Judicial District, Deer Lodge County, of Partner or Family Member Assault.  We affirm.

¶2     We address the following issues on appeal:

¶3     1.  Did the State present sufficient evidence that Ankeny and the alleged victim were "partners" so as to sustain Ankeny's conviction for Partner or Family Member Assault?

¶4     2.  Did the District Court err in admitting expert testimony that domestic violence victims commonly recant?

¶5     3.  Did Ankeny's trial counsel provide effective assistance?

**Factual and Procedural Background**

¶6     On October 15, 2008, Ankeny was charged by Information with Partner or Family Member Assault (PFMA), a felony, in violation of § 45-5-206(1)(a), MCA.  The Information alleged that Ankeny caused bodily injury to his girlfriend, Shannon Carter, while the two were driving around together in the early morning hours of October 5, 2008.

¶7     According to the Affidavit in Support of Motion for Leave to File an Information, Carter initially told law enforcement officers that

> she had been in the vehicle with [Ankeny], whom she describes as her boyfriend, and that when she told him that she wanted to go home and be with her kids [Ankeny] "freaked out" and started choking her.  She stated that she was on the driver's side and that [Ankeny] reached over and pulled the car keys out of the ignition and tossed them out the passenger window.  She then stated that she jumped out of the car and took off running down

2

the highway and was hiding in the ditch so [Ankeny] could not find her as she was terrified of him.

The affidavit also stated that although Carter refused to sign a domestic rights form, she did allow the officers responding to the scene to transport her to the station where photographs were taken of the red marks on the right side of her neck.

¶8 The day after the incident, Carter wrote two letters, one to the judge and one to the prosecuting attorney, wherein she asked that the charges against Ankeny be dropped. She claimed that the charges were false and that Ankeny had not tried to harm her.

¶9 Similarly, at trial, Carter denied that Ankeny had tried to choke her. Carter testified that after bar hopping for a bit, she and Ankeny went for a drive in her car. Carter admitted that she had at least 18 drinks over the course of that evening and that she was intoxicated and in no condition to drive. Carter testified that although she and Ankeny argued about whether she should try to drive home, nothing physical happened. She also testified that she got upset when Ankeny took the keys out of the ignition to prevent her from driving because she needed to get home to her children as it was almost 4:00 a.m. She said that she eventually left the car and started to walk home.

¶10 Ankeny testified on his own behalf at trial. He said that he and Carter were out on their first date together and that they had spent much of the evening drinking. Since neither he nor Carter was in any condition to drive, he told Carter that they should "stop and sober up" before trying to go home. He testified that he tried to reason with Carter, but she kept telling him that she needed to get home. Consequently, Ankeny took the keys out of the ignition. Ankeny further testified that, at some point, Carter left the car

and started to walk home. He stated that he did not harm Carter prior to her leaving the car, nor did he attempt to follow her once she left the car. Instead, he either fell asleep or passed out in the passenger seat of the vehicle where officers found him some time later and arrested him.

¶11     The initial call to the police regarding this incident came from Shane Nisbet, Carter's former boyfriend and the father of one of her children. Although Nisbet and Carter had split up a few days earlier, they were still living in the same house and Nisbet was watching Carter's three kids that night. Carter had called Nisbet from her cell phone after exiting the car to request that Nisbet come and get her, but because the children were asleep in bed, Nisbet was unable to do so. After Carter's call, Nisbet placed two calls to 9-1-1 to report that Ankeny had tried to choke Carter.

¶12     In their testimony at trial, Carter and Nisbet recounted different versions of their telephone conversation that night. Nisbet testified that he called the police because Carter was hysterical when she phoned him. He claimed that Carter told him that she had jumped out of the car because Ankeny had tried to kill her. Carter, on the other hand, testified that Nisbet had fabricated the story that Ankeny had tried to kill her because Nisbet was angry with her for seeing Ankeny. Carter maintained that she simply asked Nisbet for a ride home, but he refused. She further testified that Nisbet threatened to have her declared unfit, that she feared she would lose her kids, and that Nisbet had made false reports about her before.

¶13     The State presented testimony from George Niland, Carter's father, at trial. Niland testified that a friend had called him that night after hearing Carter's name over a

4

police scanner. Niland drove to the location and, when he arrived, he found Carter distraught and "kind of hysterical." According to Niland, Carter initially did not want to talk to the officers because she was afraid she was going to lose her kids. Niland eventually persuaded Carter to speak with the officers. He testified that he overheard Carter tell the officers several times that Ankeny had not attempted to choke her, but she did at one point relent and say that he did.

¶14 In addition to introducing photographs of the red marks on Carter's neck taken the night of the incident, the State called Joe Thompson, a social worker, to testify as an expert on the issue of domestic violence. Thompson testified that it was not unusual for victims of domestic violence to be cooperative with the police initially because they want to be protected, but the next day they may have second thoughts and recant. While Thompson was not asked to relate his testimony to the facts in this case, the prosecutor stated the following about Thompson's testimony in her closing argument:

> [T]he purpose of [Thompson's] testimony was to help you understand why victims of domestic violence; it's common that victims recant. And that's what we had in this statement. We have a recant.
> The next day; oh, and he told you the reason; hope, love, fear. This is a new relationship, wanting it to; with Carl Ankeny, wanting it to continue. Common to go from the same relationship; abusive relationship into another. That's what happened here. She recanted and it's common for victims of domestic violence; which she is by her own admission, common to recant.
> And he's an expert. And as you heard he's been in this field for over twenty years.

¶15 The jury convicted Ankeny of felony PFMA. The District Court designated Ankeny a persistent felony offender and sentenced him to twelve years at Montana State Prison, with five years suspended. Ankeny now appeals his conviction.

**Issue 1.**

¶16 *Did the State present sufficient evidence that Ankeny and the alleged victim were "partners" so as to sustain Ankeny's conviction for PFMA?*

¶17 Both Carter and Ankeny testified at trial that this was their first date. Consequently, Ankeny asserts on appeal that he was wrongly convicted of PFMA because going out on a first date does not make a person a "partner." The State asserts on the other hand that the evidence presented was more than sufficient for a rational trier of fact to conclude that Carter and Ankeny were "partners." The State further asserts that there was sufficient evidence to show that Ankeny assaulted Carter—an element of the offense not challenged on appeal.

¶18 "We review the sufficiency of the evidence in a criminal matter to determine whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Potter*, 2008 MT 381, ¶ 15, 347 Mont. 38, 197 P.3d 471 (quoting *State v. Weigand*, 2005 MT 201, ¶ 7, 328 Mont. 198, 119 P.3d 74).

¶19 Ankeny was convicted of violating § 45-5-206(1)(a), MCA, which provides:

> **Partner or family member assault -- penalty.** (1) A person commits the offense of partner or family member assault if the person:
> (a) purposely or knowingly causes bodily injury to a partner or family member . . . .

A "family member" is defined in § 45-5-206(2)(a), MCA, to include "mothers, fathers, children, brothers, sisters, and other past or present family members of a household."

Whereas "partners" are defined in § 45-5-206(2)(b), MCA, as

spouses, former spouses, persons who have a child in common, and persons who have been or are currently in *a dating or ongoing intimate relationship* with a person of the opposite sex. [Emphasis added.]

¶20 In challenging the sufficiency of the evidence on the issue of whether Ankeny and Carter were "partners" within the meaning of § 45-5-206(2)(b), MCA, Ankeny cites to numerous cases from other jurisdictions to define the concept "dating relationship." He maintains that "the words 'dating relationship' provoke a different 'common usage' from one person to the next." And that "[a]ny attempt to discern a universal meaning for this phrase is 'problematic.' "

¶21 We have repeatedly held that, when interpreting a statute, we must seek to implement the intention of the Legislature. *In re K.M.G.*, 2010 MT 81, ¶ 26, 356 Mont. 91, 229 P.3d 1227 (citing § 1-2-102, MCA; *Mont. Vending v. Coca-Cola Bottling Co.*, 2003 MT 282, ¶ 21, 318 Mont. 1, 78 P.3d 499). We determine the intention of the Legislature first from the plain meaning of the words used, and if interpretation of the statute can be so determined, we may not go further and apply any other means of interpretation. *State v. Trull*, 2006 MT 119, ¶ 32, 332 Mont. 233, 136 P.3d 551 (citing *Dunphy v. Anaconda Company*, 151 Mont. 76, 79-81, 438 P.2d 660, 662 (1968); *see also Tongue River Elec. Coop. v. Mont. Power Co.*, 195 Mont. 511, 515, 636 P.2d 862, 864 (1981); *Haker v. Southwestern Ry. Co.*, 176 Mont. 364, 369, 578 P.2d 724, 727 (1978); *State ex rel. Huffman v. District Court*, 154 Mont. 201, 204, 461 P.2d 847, 849 (1969). Moreover, "[i]n the search for plain meaning, 'the language used must be reasonably and logically interpreted, giving words their usual and ordinary meaning.' " *Gaub, v.*

*Milbank Ins. Co.*, 220 Mont. 424, 427, 715 P.2d 443, 445 (1986) (quoting *Matter of McCabe*, 168 Mont. 334, 339, 544 P.2d 825, 828 (1975)).

¶22    We have also held that the Legislature need not define every term that it employs when constructing a statute.  "If a term is one of common usage and is readily understood, it is presumed that a reasonable person of average intelligence can comprehend it."  *Trull*, ¶ 33 (citing *State v. Nye*, 283 Mont. 505, 513, 943 P.2d 96, 101 (1997)).

¶23    We conclude that the term "dating" is not ambiguous, obscure or incomprehensible.  It is a term of common usage and can be readily understood by a reasonable person of average intelligence.  Nevertheless, the statute defining "partners" does not refer only to "dating," it actually refers to a "dating or ongoing intimate relationship."

¶24    In this case, although Carter and Ankeny both testified that this was their "first date," the evidence showed that there was a longer relationship between the two than just one date.  In addition, the jury could infer from the evidence presented that Carter's and Ankeny's relationship was more than likely "intimate."

¶25    Carter wrote two letters the day after the incident, one to the judge and one to the prosecuting attorney, wherein she asked that the charges against Ankeny be dropped.  In those letters, Carter referred to Ankeny as her "boyfriend" and stated that they had been dating for about a month.  And, although, Carter testified at trial that on the night in question, she and Ankeny had "just started dating," she admitted that at that time, she had

8

been seeing Ankeny "for about a month." She also stated that at least one of the red marks on her neck on the night of the incident was a "hickey."

¶26    Ankeny lived with Carter and Nisbet for several months in the summer and fall of 2008. Nisbet testified that he asked Ankeny to move out a few weeks before the incident in question because Nisbet suspected that "something was going on" between Carter and Ankeny when he saw them holding hands. Nisbet also described an incident prior to Ankeny moving out where Carter did not come home one night as expected. When Nisbet went to look for her, he found Carter with Ankeny at a friend's house.

¶27    Ankeny testified that on the night in question, he and Carter were driving around in her car enjoying the scenery. He stated that they "made sure we stopped *and did adult things too*. [Emphasis added.]" We conclude that this testimony along with Carter's testimony regarding the marks on her neck were sufficient to show that the two had not only been "dating," but had an "intimate" relationship.

¶28    The purpose of domestic violence legislation

> is to protect victims from harm caused by the persons whose intimate physical relationship to the victim increases the danger of harm, either because the parties live in physical proximity or because the relationship is one whose intimacy may disable the victim from seeking protection.

*Barnett v. Wiley*, 103 S.W.3d 17, 19 (Ky. 2003) (quoting Louise E. Graham and James E. Keller, 15 *Kentucky Practice: Domestic Relations Law*, § 5.1 at 107 (2d ed. West 1997)).

¶29    Therefore, although both Carter and Ankeny testified that this was their "first date," there was sufficient evidence presented at trial to show that Carter and Ankeny

9

were in "a dating or ongoing intimate relationship" and were, indeed, partners as provided by § 45-5-206(2)(b), MCA.

**Issue 2.**

¶30   *Did the District Court err in admitting expert testimony that domestic violence victims commonly recant?*

¶31   Prior to trial, the State filed a notice that it would present expert testimony on domestic violence issues. Ankeny filed a motion in limine to exclude this testimony wherein he argued three grounds for his motion. First, that under Montana law, an expert's opinion testimony cannot be used to bolster a witness's credibility as credibility is a question that should be left to the sole discretion of the jury. Second, that the State's intended use of the expert's testimony violates both the Montana and United States constitutional limits on the admissibility of hearsay evidence. And, third, that the State's proffered expert does not qualify as an expert witness in this case.

¶32   Following a hearing, the District Court denied Ankeny's motion and allowed the State to call its expert. Thus, at trial, the State called Joe Thompson, a social worker, who testified that, in general, it was not unusual for domestic violence victims to recant allegations of abuse. Thompson was not asked to offer any opinion or testimony relative to the facts or parties involved in this case.

¶33   Ankeny now argues on appeal that Thompson's testimony was erroneously admitted in the absence of a proper foundation. He contends that since he and Carter were not in a domestic relationship, Thompson's testimony about the tendency of domestic violence victims to recant was "inflammatory, prejudicial and irrelevant."

10

¶34    The State contends that Ankeny conceded at trial that the foundational requirements for Thompson's expert opinion had been met.  Consequently, the State argues that we should reject Ankeny's arguments regarding Thompson's testimony because those arguments were waived by Ankeny's acquiescence and failure to object.

¶35    The general rule in Montana is that a defendant "waives an objection and may not seek appellate review when a defendant fails to make a contemporaneous objection to an alleged error in the trial court."  *State v. Paoni*, 2006 MT 26, ¶ 16, 331 Mont. 86, 128 P.3d 1040 (citing § 46-20-104(2), MCA; *State v. Olsen*, 2004 MT 158, ¶ 10, 322 Mont. 1, 92 P.3d 1204).  However, a motion in limine can preserve an issue for appeal in some instances even though a contemporaneous objection to an alleged error is not made at trial.  *See State v. McLaughlin*, 2009 MT 211, ¶ 22, 351 Mont. 282, 210 P.3d 694 (citing *State v. Weeks*, 270 Mont. 63, 85, 891 P.2d 477, 490 (1995); *State v. Vukasin*, 2003 MT 230, ¶ 29, 317 Mont. 204, 75 P.3d 1284).

¶36    While motions in limine are not provided for in either the statutes of Montana or the Rules of Civil Procedure, they have been recognized as valid and useful procedures by this Court in numerous cases.  *State v. Lias*, 218 Mont. 124, 128, 706 P.2d 500, 503 (1985) (Hunt, J. dissenting) (citing William F. Crowley, *Montana Pleading and Practice Forms*, p. 99 (1983)).

> "The Latin phrase 'in limine' means 'at the threshold' or 'in the beginning' and was used at the early common law to denote motions that were preliminary in character.  Currently, however, the term is used to denote motions made before or even during trial to forbid certain lines of inquiry or limit or prohibit the use of particular evidence."

*Lias*, 218 Mont. at 128, 706 P.2d at 503 (quoting *Crowley* at 99).

¶37 "Because a motion in limine is a pre-trial objection to evidence, a party need not continually renew the objection to preserve alleged errors for appeal." *Hulse v. State, Dept. of Justice*, 1998 MT 108, ¶ 46, 289 Mont. 1, 961 P.2d 75 (citing *Barrett v. ASARCO, Inc.*, 245 Mont. 196, 205, 799 P.2d 1078, 1083-84 (1990)). However, " 'specific objections must be made to portions of testimony deemed inappropriate; broad general objections do not suffice.' " *Vukasin*, ¶ 27 (quoting *Weeks*, 270 Mont. at 85, 891 P.2d at 490).

¶38 Moreover, the purpose of a motion in limine is

> "to prevent the introduction of evidence which is irrelevant, immaterial, or unfairly prejudicial. Accordingly, the authority to grant or deny a motion in limine rests in the inherent power of the court to admit or exclude evidence and to take such precautions as are necessary to afford a fair trial for all parties."

*Cooper v. Hanson*, 2010 MT 113, ¶ 38, 356 Mont. 309, 234 P.3d 59 (quoting *State v. Krause*, 2002 MT 63, ¶ 32, 309 Mont. 174, 44 P.3d 493). We further stated in *Cooper* that counsel may want

> to avoid objecting to improper arguments in front of the jury, as such objections only underscore the inappropriate points made by opposing counsel. We have historically encouraged the filing of motions in limine for precisely this reason.

*Cooper*, ¶ 38 (quoting *State v. Ingraham*, 1998 MT 156, ¶ 36, 290 Mont. 18, 966 P.2d 103 ("A motion in limine has special advantages . . . . A party may not wish to register an objection in the presence of the jury for tactical reasons, yet may wish to preserve the objection on appeal.")).

12

¶39 In summary, we hold that a motion in limine may relieve a party of the obligation to contemporaneously object at trial providing that the motion is specific and articulates the grounds for the objection.

¶40 In this case, we conclude that, in all but one instance, Ankeny's motion in limine was specific enough to preserve Ankeny's arguments for appeal. As indicated previously, the three grounds Ankeny raised in his motion in limine for excluding Thompson's testimony are: 1) that under Montana law, an expert's opinion testimony cannot be used to bolster a witness's credibility as credibility is a question that should be left to the sole discretion of the jury; 2) that the State's intended use of the expert's testimony violated both the Montana and United States constitutional limits on the admissibility of hearsay evidence; and 3) that the State's proffered expert does not qualify as an expert witness in this case. We address each of these arguments in turn.

¶41 In the first of his arguments, Ankeny contended that the testimony would impermissibly lend a perception of scientific legitimacy to the State's theory because "[e]xpert testimony regarding credibility improperly invades the jury's function by placing a stamp of scientific legitimacy on the victim's allegations." *State v. Harris*, 247 Mont. 405, 409, 808 P.2d 453, 455 (1991) (citing *State v. Brodniak*, 221 Mont. 212, 222, 718 P.2d 322, 329 (1986)).

¶42 In this case, Thompson did not offer any opinion or testimony relating to the facts or parties involved in this case. Instead, the purpose of his testimony was to educate the jury as to why victims of domestic violence often recant. Furthermore, defense counsel

13

took full advantage of the opportunity to cross examine Thompson and to challenge his opinion.

¶43    M. R. Evid. 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

"[T]he test for admissibility of expert testimony is whether the matter is sufficiently beyond common experience that the opinion of the expert will assist the trier of fact to understand the evidence or to determine a fact in issue." *State v. Price*, 2007 MT 269, ¶ 23, 339 Mont. 399, 171 P.3d 293 (citing *State v. Ayers*, 2003 MT 114, ¶ 36, 315 Mont. 395, 68 P.3d 768).

¶44    In *State v. Stringer*, 271 Mont. 367, 377, 897 P.2d 1063, 1069 (1995), this Court stated that "expert testimony on battered woman syndrome should generally be admissible . . . ." In *Stringer*, although the defendant's wife initially made statements describing the events that gave rise to the charges against the defendant, she subsequently recanted those statements at trial. *Stringer*, 271 Mont. at 373, 897 P.2d at 1067. Nevertheless, the jury convicted defendant. One of the issues on appeal was the district court's failure to exclude the expert testimony. We stated in *Stringer* that

> the evidence was not offered to bolster [the wife's] testimony, but to provide the jury with an explanation for the inconsistencies in her testimony. Furthermore, the expert did not comment as to which of [the wife's] statements were more credible or offer an opinion on whether [the wife] is a battered spouse. Rather, she merely provided the jury with information to aid the jury in evaluating the evidence. This type of limited testimony does not invade the jury's role in determining the credibility of witnesses.

*Stringer*, 271 Mont. at 377, 897 P.2d at 1069 (citing *Arcoren v. U.S.*, 929 F.2d 1235, 1241 (8th Cir. 1991)). Moreover, we determined in *Stringer* that the State must lay an appropriate foundation to consider battered spouse syndrome, including showing that the battered spouse was subjected to multiple cycles of violence. *Stringer*, 271 Mont. at 377, 897 P.2d at 1069-70.

¶45 In the case *sub judice*, the State presented sufficient foundational evidence that Carter had been in a long-term abusive relationship with Nisbet, her ex-boyfriend; that there had been multiple incidents of abuse; and that Nisbet had often been the abuser. Despite such history of domestic violence, Carter had continued to return to that abusive relationship and had even commenced another allegedly abusive relationship with Ankeny. Furthermore, Thompson's testimony was not offered to bolster Carter's testimony, comment as to her credibility, or establish that Carter was a battered woman. Rather, Thompson's testimony simply provided the jury with an explanation for the inconsistencies in Carter's testimony.

¶46 As to Ankeny's second specification of error, he contends that the State relied on inadmissible third-party hearsay statements as foundation for Thompson's expert testimony. Ankeny points out that hearsay evidence is not allowed other than in a few limited exceptions. He maintains that in this case, where the alleged victim testified, admission of third-party commentary on her statements should not be allowed.

¶47 Under M. R. Evid. 801(d)(1), a statement is not hearsay if: "The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and

15

the statement is . . . inconsistent with the declarant's testimony . . . ." In this case, the declarant is Carter, the alleged victim. Because Carter testified at trial regarding her inconsistent statements to Nisbet, to law enforcement officers, and to her father, and because she was subject to cross-examination regarding these statements, her statements were not hearsay.

¶48 Finally, as to Ankeny's third specification of error—that Thompson was not qualified as an expert in domestic violence—Ankeny waived this argument at trial. After Thompson explained both his educational and work experience relating to domestic violence, the State moved to qualify Thompson as an expert in this area.

> [The prosecutor]: The State moves to qualify Mr. Thompson as an expert.
> The Court: Any objection?
> [Defense counsel]: No, Your Honor.
> The Court: Alright, without objection Mr. Thompson is qualified as an expert in the field of domestic violence.

Consequently, by his acquiescence at trial to Thompson's qualifications as an expert in the field of domestic violence, Ankeny has waived this argument on appeal, notwithstanding his earlier motion in limine.

¶49 Accordingly, we hold that the District Court did not err in admitting expert testimony that domestic violence victims commonly recant.

**Issue 3.**

¶50 *Did Ankeny's trial counsel provide effective assistance?*

¶51 Ankeny contends that his trial counsel provided ineffective assistance because counsel failed to object to the admission of hearsay statements allegedly made by Carter

16

to Nisbet; the admission of the 9-1-1 tapes made by Nisbet; and the prosecutor's numerous references to her belief in Ankeny's guilt.

¶52 Ineffective assistance of counsel claims are mixed questions of law and fact that we review de novo. *State v. Gunderson*, 2010 MT 166, ¶ 66, 357 Mont. 142, 237 P.3d 74 (citing *State v. Crosley*, 2009 MT 126, ¶ 27, 350 Mont. 223, 206 P.3d 932, *overruled in part by Robinson v. State*, 2010 MT 108, 356 Mont. 282, ___ P.3d ___; *State v. Herrman*, 2003 MT 149, ¶ 18, 316 Mont. 198, 70 P.3d 738). Both the Sixth Amendment to the United States Constitution and Article II, Section 24 of the Montana Constitution guarantee an individual the right to the effective assistance of counsel in all criminal prosecutions. When this Court reviews claims of ineffective assistance of counsel, we employ the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). *Gunderson*, ¶ 67 (citing *Crosley*, ¶ 54; *State v. Kougl*, 2004 MT 243, ¶ 11, 323 Mont. 6, 97 P.3d 1095). This test requires that the defendant establish (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different. *Gunderson*, ¶ 67.

¶53 To prevail on a claim of ineffective assistance of counsel, a defendant must satisfy both parts of the *Strickland* test. *Gunderson*, ¶ 68 (citing *Whitlow v. State*, 2008 MT 140, ¶ 11, 343 Mont. 90, 183 P.3d 861; *Adams v. State*, 2007 MT 35, ¶ 22, 336 Mont. 63, 153 P.3d 601). Consequently, if a defendant makes an insufficient showing regarding one part of the test, there is no need to address the other part. *Gunderson*, ¶ 68.

¶54 As to the first part of the test, *Strickland* provides that "a reviewing court 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' and the defendant 'must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.' " *Whitlow*, ¶ 21 (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065). And, as to the second part of the test, we have stated that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Crosley*, ¶ 55 (quoting *State v. Harris*, 2001 MT 231, ¶ 19, 306 Mont. 525, 36 P.3d 372, *overruled in part by Robinson v. State*, 2010 MT 108, 356 Mont. 282, ___ P.3d ___).

¶55 Before this Court may reach the merits of an ineffective assistance of counsel claim on direct appeal, we must determine whether the allegations are properly before us. *Gunderson*, ¶ 70 (citing *Hagen v. State*, 1999 MT 8, ¶ 11, 293 Mont. 60, 973 P.2d 233). If the claims of ineffective assistance of counsel are based on facts of record, they must be raised on direct appeal. But, if the claims cannot be documented from the record, then they must be raised in a petition for postconviction relief. *Gunderson*, ¶ 70.

¶56 We stated in *Gunderson* that

> "[t]he test to determine if an ineffective assistance claim is properly brought on direct appeal is whether the record contains the answer to 'why' counsel took, or failed to take, action in providing a defense." *State v. Upshaw*, 2006 MT 341, ¶ 33, 335 Mont. 162, 153 P.3d 579 (citing *State v. White*, 2001 MT 149, ¶ 20, 306 Mont. 58, 30 P.3d 340). If the record on appeal explains "why," we will then address the issue on appeal. If, however, the claim is based on matters outside the record on appeal, we may refuse to address the issue on appeal and allow the defendant to file a postconviction proceeding where the defendant can develop a record as to "why" counsel acted as alleged, thus allowing the court to determine whether counsel's performance was ineffective or merely a tactical decision. *Kougl*, ¶ 14 (We

18

also pointed out in *Kougl* that it is sometimes unnecessary to ask "why" in the first instance as when counsel is faced with an obligatory, and therefore non-tactical, action. The question then is not "why" but "whether" counsel acted, and if so, if counsel acted adequately.).

*Gunderson*, ¶ 71.

¶57    In the case *sub judice*, Ankeny complained that his trial counsel failed to object to the admission of hearsay statements allegedly made by Carter to Nisbet; the admission of the 9-1-1 tapes made by Nisbet; and the prosecutor's numerous references to her belief in Ankeny's guilt. Because such claims involve "omissions," they are frequently ill-suited for direct appeal. *Gunderson*, ¶ 77 (citing *State v. Taylor*, 2010 MT 94, ¶ 21, 356 Mont. 167, 231 P.3d 79).

¶58    As to the admission of the hearsay statements allegedly made by Carter to Nisbet, there is a record-based explanation for why counsel did not object. And, as the State points out in its brief on appeal, that record-based explanation actually shows proficient performance by defense counsel rather than deficient performance. After a discussion with the judge on the record, defense counsel conceded that this was not hearsay because it was a prior inconsistent statement.[1] Ankeny now concedes this point in his reply brief on appeal.

¶59    As to Ankeny's other claims of ineffective assistance of counsel regarding counsel's failure to object to the admission of the 9-1-1 tapes made by Nisbet and the prosecutor's numerous references to her belief in Ankeny's guilt, the record in this case

---

[1] "[A] prior oral or written statement inconsistent with the testimony of a trial witness is admissible." *State v. Herman*, 2009 MT 101, ¶ 37, 350 Mont. 109, 204 P.3d 1254 (citing M. R. Evid. 801(d)(1)).

contains no information on whether counsel's failure to object was reasonable under the circumstances or due to deficient performance. Accordingly, we hold that these claims are best suited for review in a postconviction proceeding and we dismiss these claims without prejudice.

## Conclusion

¶60 Based on the foregoing, we affirm the judgment of the District Court.

¶61 Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ W. WILLIAM LEAPHART