FILED

12/16/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 25-0036

DA 25-0036

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 287

JENNIFER SHAHOOD,

     Plaintiff and Appellee,

  v.

CITY AND COUNTY OF BUTTE-SILVER BOW,

     Defendant and Appellant.

APPEAL FROM:   District Court of the Second Judicial District,
                In and For the County of Butte-Silver Bow, Cause No. DV-19-400
                Honorable Kurt Krueger, Presiding Judge

COUNSEL OF RECORD:

     For Appellant:

          Cynthia L. Walker, Christopher L. Decker, Boone Karlberg P.C., Missoula, Montana

     For Appellee:

          Patrick T. Fox, James G. Hunt, Hunt & Fox, PLLP, Helena, Montana

Submitted on Briefs:  September 24, 2025

Decided:  December 16, 2025

Filed:

                            _____
                                    Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1 Jennifer Shahood filed suit against City and County of Butte-Silver Bow ("BSB") in the Second Judicial District Court, Butte-Silver Bow County, seeking to recover damages arising from a motor vehicle accident in which a snow grader operated by BSB backed into Shahood's sedan at a low speed. After a jury found Shahood 54% negligent, Shahood moved for a new trial. The District Court granted Shahood's M. R. Civ. P. 59(a) motion based on irregularity in the proceedings and insufficient evidence to support the jury's verdict. BSB appeals, asserting the District Court erred in ordering a new trial because Shahood waived the arguments raised in her Rule 59 motion and because the jury's verdict was ultimately supported by substantial evidence. Additionally, BSB argues the District Court erred in granting a directed verdict in favor of Shahood on the issues of BSB's negligence, negligence per se, and causation. BSB also contends the District Court erred in denying its motion for partial summary judgment on Shahood's negligence per se, and in categorically excluding the admission of Shahood's medical records. We reverse.

¶2 We consider the following dispositive issue on appeal:

*Did the District Court err in granting Shahood a new trial?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 On March 13, 2019, Brian Moe and Marty Hanley, employees of BSB, were using road graders to perform snow removal operations when Moe backed a grader into Shahood's Mitsubishi Lancer at approximately 1 to 1.5 mph. The accident occurred on Main Street in Butte, Montana, just north of the Front Street intersection.

2

¶4 Shahood sued BSB for negligence and negligence per se based on Moe's alleged failure to exercise ordinary care and comply with Montana's statutory traffic regulations. BSB denied negligence and argued that the traffic regulations at issue did not apply to equipment actively engaged in snow removal operations, pursuant to § 61-8-106(2), MCA. Additionally, BSB asserted that Shahood was negligent for failing to yield to equipment performing highway maintenance activities, as statutorily required by § 61-8-317, MCA.

¶5 A five-day jury trial commenced on May 28, 2024. Testimony established that at the time of the accident, Moe and Hanley were working in tandem to remove snow from the center line of Main Street by connecting the blades of their two graders together and pushing the snow north, away from the Front Street intersection. To accomplish this, both graders needed to be positioned to travel north. Thus, the front of Moe's grader was positioned to the north despite the grader occupying the southbound side of Main Street.

¶6 In his testimony, Moe explained that he was reversing his grader to meet Hanley at the top of the snow windrow on the north side of the Front Street intersection when the accident occurred. Moe testified that he checked his mirrors and back-up camera prior to reversing to make sure no vehicles were behind him and that the light at the Front Street intersection was green. Moe went on to state that after he confirmed that all was clear behind him and that the light was green, he began to slowly back up, using the windrow of snow to guide his position. Moe explained that when "you're backing up . . . [y]ou don't want to be in the pile of snow and scattering it everywhere; and you don't want to be away from [it] because you have to be able to reach it with the grader." Moe stated that it was during this time—while he was already actively reversing—that Shahood's vehicle began

3

approaching as it headed south on Main Street. Moe testified that Shahood proceeded to pass him using the rightmost lane of the southbound side of Main Street (the lane furthest to Moe's left), and that "she was well outside" of the grader while doing so. Moe said that he watched Shahood as she passed, stating, "I turned my head to watch her until I couldn't see her anymore." Moe explained that he was lining up with Hanley's grader and slowing down to touch blades when he heard his grader strike Shahood's vehicle, only seconds after he saw Shahood pass by in the right lane. Given his location when Shahood had passed him and the location where the accident occurred, Moe estimated that Shahood pulled into the center lane approximately 10 to 15 feet behind the actively reversing grader.

¶7 Moe further testified that he had been in first gear while reversing and that the grader's top speed was therefore limited to 2 mph. Moe went on to explain that because he was already in the process of stopping to connect the blades of the graders when the accident occurred, he believed his speed to be about 1 mph at the time of impact. Additionally, Moe and Hanley both averred that Moe's grader had been displaying flashing lights in compliance with the requirements set forth by the Montana Department of Transportation and that the grader's automatic back-up alarm had been sounding.

¶8 Shahood explained in her testimony that after she passed the grader in the right lane, she merged to the center lane and came to a stop at a red light at the Front Street intersection. Shahood stated that it was while her vehicle was stopped at the Front Street intersection that the accident occurred. Shahood testified that she didn't see any lights or warning devices as she passed the graders and that she never heard any alarm. Additionally, Shahood testified that she never saw the grader moving. When asked what

4

lane the grader was in, Shahood answered that it was in "the center; like, occupying both the center – well, mostly, I'm sorry, the center and turning lane." Shahood also stated that she pulled into the center lane about "two car lengths" behind the grader. Shahood explained that she had been concerned about moving into the center lane because she didn't know what the graders and equipment operators were doing. However, when asked whether she was "paying attention at all to the road grader" after pulling in behind it, Shahood replied, "I was not."

¶9 The jury also heard from Sergeant Tymofichuk, who responded to the accident scene after Shahood called 911. Tymofichuk stated that he considered the accident minor in comparison to other accidents he investigated being that there appeared to be no injuries and the damage appeared limited to a broken tail light. While Tymofichuk listed on the police report that Moe's inattentiveness was cause for the accident, he testified that if the grader was actively backing up at the time Shahood passed it, Shahood would bear some of the responsibility as well. Tymofichuk provided that motorists have "a duty to give [working equipment] a wide berth and . . . give them room to work," as well as a statutory duty to yield the right-of-way to working equipment. Tymofichuk also testified that Shahood had several options to avoid the working equipment, and had she taken those options, the accident would not have occurred.

¶10 Shahood's accident reconstructionist, Steve Harbinson, acknowledged that Moe's grader could have been moving slowly when Shahood passed him, and that if it was moving, Moe would be actively engaged in highway maintenance work. Harbinson also estimated Moe's speed to be around 1.5 mph at the time of impact. Harbinson theorized

5

that based on photos of the crash scene, and a study of the forces involved in the collision, Shahood's vehicle was pushed 9 to 10 feet forward as the grader continued to reverse after impact. However, Hanley testified to the contrary; because the blades of the two graders were touching, Hanley explained, the clutch relief valve on his (Hanley's) grader would have engaged had Moe continued to reverse, and it never did.

¶11 On cross-examination, Harbinson agreed that a driver should use caution after observing flashing lights on equipment. Harbinson also recognized that Shahood had an obligation to pay attention to what other vehicles on the road were doing. Additionally, Harbinson admitted that the speed at which the collision occurred was the lowest he'd ever considered in more than 2,000 accident reconstructions and that he was unaware of any other collisions of less than 2.5 mph causing neck injuries.

¶12 The jury also heard testimony from multiple witnesses regarding the injuries Shahood allegedly suffered as a result of the collision. While Tymofichuk testified that no injuries appeared to have resulted from the crash, Connor O'Neal, a responding EMT, stated that Shahood mentioned that she was experiencing back pain, though she had adamantly refused treatment at the scene. Additionally, the jury heard from a nurse practitioner who testified to treating Shahood in the emergency room a few hours after the accident for "left back, shoulder, and hip pain," but not "neck pain," and testimony from Shahood's primary care physician and chiropractor who both concluded that Shahood was injured as a result of the crash. BSB challenged Shahood's witnesses on cross-examination regarding relevant preexisting physical and mental conditions. Dr. Martini, one of Shahood's treating physicians, admitted that during his deposition he had stated that the

"elephant in the room" was whether Shahood's symptoms were the result of an injury or the natural progression of her previous condition. Additionally, Dr. Martini acknowledged that Spine Journal, a peer-reviewed and authoritative source for medical literature, recently published an article recognizing that human volunteers could safely be exposed to rear impacts of less than 18 kilometers per hour without any meaningful risk of injury.

¶13 After the close of evidence, Shahood moved for a partial directed verdict on BSB's negligence, negligence per se, and causation, but not on the issue of comparative negligence. Shahood's counsel stated to the court, "[Shahood] concedes [BSB's] defense [of comparative negligence] must remain on the verdict form if the [c]ourt grants [Shahood's] requested relief." Shahood's counsel explained further that by not seeking a directed verdict on comparative negligence, the District Court would not be taking comparative negligence out of the issue of causation, and that the jury would still have the opportunity "to say Ms. Shahood caused injury to herself and that she's 60 percent negligent and she doesn't recover anything." The District Court agreed, recognizing that "[t]he Montana Supreme Court has repeatedly affirmed that the factfinder should consider a claim of plaintiff's negligence, even if the defendant is found negligent per se." The District Court granted Shahood judgment as a matter of law on the issues of BSB's negligence, negligence per se, and causation. The District Court explained, "this judgment as a matter of law requires a determination by the jury of the Plaintiff's negligence if that issue has not been decided as a matter of law, and it has not."

¶14 Following the District Court's order granting Shahood's motion for directed verdict, trial proceeded to closing arguments. During BSB's closing argument, counsel stated that

"[Shahood] crowded the plow" and explained that a person exercising reasonable care would not put themselves in the near path of a road grader. Counsel went on to reference the agreed upon jury instruction, which provided that a motorist has a statutory duty to yield to the right-of-way of working equipment, as well as a "duty to see, to look where they are going and see that which is in plain sight." BSB's counsel also stated that Moe was a "working man" in response to statements made by Shahood's counsel attacking Moe's testimony as being inconsistent with parts of his initial accident report.[1] Additionally, counsel for BSB stated, "I don't know what was on [Shahood's] mind, whether she was distracted in some way," in reference to Shahood's decision to position her vehicle where she had and her failure to notice the grader's lights flashing and alarm sounding.

¶15 Using the special verdict form proposed by Shahood, the jury returned a verdict finding Shahood negligent. The jury apportioned 54% of the negligence to Shahood and 46% to BSB, effectively barring Shahood's recovery under § 27-1-702, MCA.

¶16 Shahood filed a motion for new trial, pursuant to M. R. Civ. P. 59(a). The District Court granted her motion, holding that irregularity in the proceedings prevented Shahood from having a fair trial, and that the evidence was insufficient to support the jury's finding of Shahood's comparative negligence.

---

[1] BSB's Vehicle Accident Reporting Form stated that Shahood had been in the "turning lane" (left lane), not the center lane, when the accident occurred.

**STANDARDS OF REVIEW**

¶17 Our standard of review as to a trial court's decision regarding a Rule 59 motion for new trial depends on the grounds of the motion. *Fish v. Harris*, 2008 MT 302, ¶ 8, 345 Mont. 527, 192 P.3d 238. Where a Rule 59 motion for a new trial is based on irregularity in the proceedings, we review a district court's decision to grant or deny the motion for a manifest abuse of discretion. *In re Guardianship of A.M.M.*, 2015 MT 250, ¶ 15, 380 Mont. 451, 356 P.3d 474. "A manifest abuse of discretion is one that is obvious, evident, or unmistakable." *Styren Farms, Inc. v. Roos*, 2011 MT 299, ¶ 12, 363 Mont. 41, 265 P.3d 1230. "The abuse of discretion must be so significant as to materially affect the substantial rights of the complaining party." *In re Guardianship of A.M.M.*, ¶ 15.

¶18 Where a Rule 59 motion is based on the insufficiency of evidence to support a verdict, we review de novo. *Giambra v. Kelsey*, 2007 MT 158, ¶ 26, 338 Mont. 19, 162 P.3d 134. Like the trial court, "we only ask whether there is substantial credible evidence in the record to support the jury's verdict." *Stubblefield v. Town of W. Yellowstone*, 2013 MT 78, ¶ 15, 369 Mont. 322, 298 P.3d 419.

**DISCUSSION**

¶19 *Did the District Court err in granting Shahood a new trial?*

¶20 Rule 59(a) allows a district court to grant a new trial after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in Montana state court." Section 25-11-102, MCA, sets forth various reasons for which a new trial may be granted. *Baxter v. Archie Cochrane Motors, Inc.*, 271 Mont. 286, 288, 895 P.2d 631, 632 (1995). Shahood relies specifically on §§ 25-11-102(1), and -102(6), MCA. Section

25-11-102(1), MCA, provides that a new trial may be granted based on "irregularity in the proceedings of the court, jury, or adverse party or any order of the court or abuse of discretion by which either party was prevented from having a fair trial." Section 25-11-102(6), MCA, provides that a new trial may be granted based on the "insufficiency of the evidence to justify the verdict." We address in turn whether Shahood is entitled to a new trial on either of these grounds.

**Irregularity in the Proceedings**

¶21 A trial court has a duty to prevent a miscarriage of justice and may grant a new trial "if the misconduct of counsel was so pervasive that it prevented one of the parties from receiving a fair trial, thereby materially affecting the party's substantial rights." *United Tool Rental, Inc. v. Riverside Contracting Inc.*, 2011 MT 213, ¶ 26, 361 Mont. 493, 260 P.3d 156. However, a party waives the right to claim improper comments as error on appeal or in a motion for a new trial if the party fails to make a contemporaneous objection to the allegedly improper comments during trial. *Reno v. Erickstein*, 209 Mont. 36, 40, 679 P.2d 1204, 1207 (1984). This is because an issue is only properly preserved for appeal if the appealing party objected when the grounds for objection become apparent. *Evans v. Scanson*, 2017 MT 157, ¶ 23, 388 Mont. 69, 369 P.3d 1284. "If defense counsel made [] allegedly inflammatory comments during closing argument, the grounds for objection became apparent during the closing argument." *Evans*, ¶ 23. Thus, if a party seeks a new trial based on allegedly improper comments made by defense counsel during a closing argument, the party must have properly preserved the issue by contemporaneously objecting to the comments during closing argument. *Evans*, ¶ 23.

10

¶22 Alternatively, "a motion in limine may relieve a party of the obligation to contemporaneously object at trial provid[ed] that the motion is specific and articulates the grounds for the objection." *State v. Ankeny*, 2010 MT 224, ¶ 39, 358 Mont. 32, 243 P.3d 391. However, a motion in limine that sets forth broad and general objections will not suffice; the motion must contain specific objections to whatever portions of testimony are deemed inappropriate in order to relieve a party of their obligation to object. *Ankeny*, ¶ 37. We have recognized that "[a] motion in limine has 'special advantages' and serves an important strategic purpose." *Anderson v. BNSF Ry.*, 2015 MT 240, ¶ 77, 380 Mont. 319, 354 P.3d 1248 (citation omitted). By preserving an issue through a motion in limine, a party may avoid drawing additional attention to improprieties by having to continually object to alleged errors in the presence of the jury. *Anderson*, ¶ 77.

¶23 Thus, § 25-11-102(1), MCA, allows a district court to grant a motion for new trial based on irregularity in the proceedings, but only if the moving party properly preserved the issue by making a timely and specific objection to the alleged improprieties at trial through contemporaneous objection, or through a motion in limine. *See Anderson*, ¶ 77; *Cooper v. Hanson*, 2010 MT 113, ¶ 38, 356 Mont. 309, 234 P.3d 59.

¶24 In granting Shahood's motion for a new trial based on irregularity in the proceedings, the District Court concluded that the statements made by BSB's counsel during closing argument, together with the general environment of juror familiarity with BSB employees displayed during voir dire, tainted the jury's impressions such that Shahood's right to a fair trial was wrongly prejudiced. The statements specifically at issue include BSB's references to Moe as a "working man," statements about there being value

11

in plowed streets, a statement suggesting that Shahood may have been distracted at the time of the incident, and a reference to a legal obligation to stay out of the way of working plows. Relying on our decision in *Cooper*, the District Court concluded BSB's statements resulted in cumulative prejudice and that Shahood's failure to contemporaneously object was excusable being that she wanted to avoid underscoring improper comments in front of the jury. The District Court, however, erroneously overlooked Shahood's failure to preserve these issues through contemporaneous objection or a motion in limine.

¶25    In *Cooper*, we held that a district court abused its discretion in denying a plaintiff's motion for new trial where "cumulative prejudice, culminating in the Defendant's unlawful appeal to the passions and prejudices of the jury, denied the plaintiff a fair trial." *Cooper*, ¶ 43. The plaintiff in that case, Cooper, argued they were entitled to a new trial because the district court denied proper challenges for cause at voir dire and because defense counsel made improper statements during closing argument. *Cooper*, ¶¶ 29-31. Notably, Cooper filed motions in limine prior to trial seeking to prohibit defense counsel from presenting improper argument to the jury regarding how "the defendant could have his professional reputation or standing damaged," how "the defendant could face consequences concerning the right to practice medicine," and, how, among other things, "the defendant could or would be financially affected by any adverse verdict." *Cooper*, ¶ 4. While the district court ultimately denied Cooper's motions in limine as vague and overbroad, defense counsel expressed offense at the suggestion that they would violate the Rules of Evidence and assured the court they would not engage in improper argument. *Cooper*, ¶ 5. However, despite their assurances, defense counsel stated during closing

12

argument that a verdict against the defendant would leave a "black mark" on the defendant's reputation, and that the community "was lucky" to have the defendant providing services there. *Cooper*, ¶ 39. Though Cooper did not object to the comments at trial, we recognized, "[u]understandably, Cooper wanted to avoid objecting to improper arguments in front of the jury, as such objections only underscore the inappropriate points made." *Cooper*, ¶ 38. While the district court had denied Cooper's motions in limine, we concluded that the court erred by not reconsidering its prior rulings in the post-trial context given defense counsel's failure to avoid improper argument, as promised. *Cooper*, ¶¶ 41-43. Thus, the issues raised in Cooper's motion for new trial were preserved by Cooper's motions in limine.

¶26   In *Evans*, we also considered a district court's denial of a motion for new trial based on several allegedly inflammatory comments made by defense counsel during closing argument. *Evans*, ¶ 22. As in *Cooper*, the plaintiff, Evans, failed to contemporaneously object to most of the allegedly impermissible comments at trial and argued the need to object had been obviated by a motion in limine. *Evans*, ¶ 23. However, while counsel for Evans had filed a motion in limine, the district court never ruled on the motion. *Evans*, ¶ 23. Recognizing that "[a] party may not preserve an issue for appeal, even if based on an opponent's violation of an order in limine, without the party first obtaining a definitive ruling from the district court on the issue," we held that Evans forfeited his right to claim error regarding the statements absent contemporaneously objection at trial. *Evans*, ¶ 23.

¶27   Here, Shahood did not contemporaneously object to BSB's statements at trial, and, unlike the plaintiff in *Cooper*, Shahood did not receive a ruling on any motion in limine

13

addressing such issues. We need not consider the propriety of BSB's statements during closing argument or make any determination regarding the creation of cumulative prejudice. Shahood did not preserve her right to raise these issues post-trial. Accordingly, the District Court abused its discretion in granting Shahood a new trial on the grounds provided by § 25-11-102(1), MCA (irregularity in the proceedings), being that its ruling was premised entirely on objections Shahood forfeited at trial.

**Sufficiency of Evidence**

¶28 BSB asserts the District Court also erred in granting a new trial on the grounds provided by § 25-11-102(6), MCA (insufficiency of the evidence to justify the verdict), because Shahood conceded that the evidence was sufficient to submit the issue of comparative negligence to the jury and thus, Shahood waived her right to seek a new trial on that basis. Additionally, BSB argues that substantial evidence supports the jury's verdict and that the verdict must therefore be sustained.

¶29 In support of its waiver argument, BSB points to Shahood's decision to move for a directed verdict on every issue but comparative negligence and underscores counsel's statements specifically conceding that the issue of comparative negligence must be decided by the jury. Furthermore, BSB notes the District Court's acknowledgment that the issue of "Shahood's comparative negligence remains for a jury." BSB contends that a litigant cannot be allowed to submit an issue to a jury and then receive a mulligan or "do-over" if it disagrees with the jury's determination.

¶30 While it is certainly wise for a trial lawyer to move for a directed verdict where there is insufficient evidence to support an opponent's claim, a failure to do so does not deprive

14

a party of the right to have the question determined on a motion for new trial. *Adami v. Murphy*, 118 Mont. 172, 180-81, 164 P.2d 150, 154 (1945). A party may, however, waive the right to challenge a jury's verdict by judicial admission. *Kohne v. Yost*, 250 Mont. 109, 112, 818 P.2d 360, 361-62 (1991).

¶31 A judicial admission is an explicit waiver made in court, by a party or a party's attorney, conceding the truth of an alleged fact for trial purposes. *Kohne*, 250 Mont. at 112, 818 P.2d at 362. A judicial admission has the effect of a confessory pleading, with its main characteristic being its "conclusive effect upon the party making the admission." *Kohne*, 250 Mont. at 112, 818 P.2d at 362. Once a judicial admission has been made, "no further evidence can be introduced to prove, disprove, or contradict the admitted fact." *Kohne*, 250 Mont. at 112, 818 P.2d at 362 (citation omitted).

¶32 To constitute a judicial admission: (1) there must be a statement made to the court; (2) the statement must be made by a party or a party's attorney; and (3) the statement must be an unequivocal statement of fact. *Bilesky v. Shopko Stores Operating Co.,* 2014 MT 300, ¶ 13, 377 Mont. 58, 338 P.3d 76. However, whether a statement qualifies as a judicial admission is also highly dependent on the specific circumstances of the case. *Kohne*, 250 Mont. at 113, 818 P.2d at 362. A court's analysis is informed by the twofold policy that underpins the rule of judicial admissions. *Bilesky*, ¶ 20. "First, like other stipulations, judicial admissions facilitate judicial efficiency and save the parties time, labor and expense." *Bilesky*, ¶ 20 (citation omitted). "Second, judicial admissions protect the integrity of the judicial process by preventing parties from playing fast and loose with the facts to suit the exigencies of self-interest." *Bilesky*, ¶ 20. Accordingly, judicial admissions

15

serve to prevent unfair advantage by self-contradiction. *Bilesky*, ¶ 20. "A party may not benefit from asserting one position and later assert a contrary position to the detriment of its opponent at trial." *Bilesky*, ¶ 20 (citation omitted).

¶33    In *Kohne*, we considered whether statements made by defense counsel constituted judicial admissions, and if so, whether substantial evidence supported a jury's apportionment of 0% negligence to a defendant in light of such admissions. *Kohne*, 250 Mont. at 112-14, 818 P.2d at 361-63. The plaintiff, a 21-year-old man, brought suit against a 13-year-old boy, alleging the boy had negligently shot him in the eye with a BB pellet during a game of "combat." *Kohne*, 250 Mont. at 110, 818 P.2d at 360. Defense counsel argued comparative negligence on the part of the plaintiff, but in doing so, counsel stated numerous times that the boy had also been at fault. *Kohne*, 250 Mont. at 111-12, 818 P.2d at 361. The jury ultimately returned a verdict finding that neither the plaintiff nor the boy was negligent. *Kohne*, 250 Mont. at 112, 818 P.2d at 362. The plaintiff moved for a new trial, arguing that based on defense counsel's admission of fault, the boy was negligent and the jury's verdict was not supported by substantial evidence. *Kohne*, 250 Mont. at 112-13, 818 P.2d at 362. The defense countered that the statements were an alternative legal theory that merely suggested the defendant's negligence. *Kohne*, 250 Mont. at 113, 818 P.2d at 362. The district court denied the plaintiff's motion for new trial and we reversed, holding that the circumstances called for treating the statements as judicial admissions given counsel's failure to preface the statements as suggestions and counsel's intentional pursuit of comparative negligence as a defense theory, which had

16

been premised on the boy being at fault—just less at fault than the plaintiff. *Kohne*, 250 Mont. at 114-15, 818 P.2d at 362-63.

¶34    In *Bilesky*, we similarly found a defendant's statements constituted judicial admissions based on the defense counsel's actions evidencing an "intentional, tactical decision." *Bilesky*, ¶ 28. The plaintiff, Bilesky, moved for sanctions against the defendant, Shopko, for spoliation of video evidence depicting Bilesky's slip and fall. *Bilesky*, ¶ 28. In response to the motion, Shopko stated in their briefing that "the loss of the video [] resulted in no prejudice to the Plaintiff or unfair advantage to Shopko," and that "the parties substantially agree on what the video would have shown." *Bilesky*, ¶ 7. The brief went on to state that the "Plaintiff sets out in her brief what the video would have shown. . . . Defendant will not disagree with these points." *Bilesky*, ¶ 7. The statements set forth by Bilesky and referenced by Shopko were unequivocal statements of fact, such as, "[Bilesky's] pants were visibly wet," "[Bilesky] fell forward," and "[Bilesky's] gait was altered." *Bilesky*, ¶ 6. At trial, Bilesky requested that Shopko's statements be read to the jury and the corresponding statements be adopted as judicial admissions. *Bilesky*, ¶ 9. Shopko argued that its statement in briefing was conditioned on the court finding sanctions appropriate and was therefore not a statement of unequivocal fact. *Bilesky*, ¶ 29. The district court denied Bilesky's request, and we reversed, finding the circumstances warranted holding the statement to be a judicial admission being that Shopko made it for the purpose of avoiding sanctions. *Bilesky*, ¶¶ 28-31. Shopko expressly stipulated to certain assertions about the contents of a video in an effort to remove any prejudice to Bilesky. *Bilesky*, ¶ 28. Just as in *Kohne*, Shopko acted intentionally and tactically by

17

asserting one position to their benefit, only to later assert a contrary position to the detriment of their opponent.

¶35    However, in *Weaver v. State*, 2013 MT 247, 371 Mont. 476, 310 P.3d 495, we found that circumstances did not warrant finding a statement to be a judicial admission. *Weaver*, ¶ 26. In *Weaver*, plaintiff property owners sued the State claiming negligence and reverse condemnation after their property was damaged as a result of wildfire containment operations. *Weaver*, ¶ 9. In a trial brief addressing the reverse condemnation claim, counsel for the property owners stated that the State's actions were "reasonable and necessary." *Weaver*, ¶ 14. The State moved to dismiss the negligence action on the basis that the statement admitted the backburn that damaged the property was reasonable and necessary, and thus not negligent. *Weaver*, ¶ 14. The property owners promptly filed a Notice of Errata to correct the language contained in the brief. *Weaver*, ¶ 14. The district court denied the State's motion to dismiss, holding that the statement was not made as an unequivocal statement of fact, but rather was made in the context of pleading an alternative, inconsistent claim, and that such a circumstance did not warrant treating the statement as a judicial admission. *Weaver*, ¶ 22. We affirmed, holding that the statement's use in the context of an alternative pleading, and the fact that Weavers promptly corrected the statement, indicated that the statement was not an admission of fact as to their alternative theory of negligence. *Weaver*, ¶ 24.

¶36    Here, like *Kohne* and *Bilesky*, Shahood's counsel intentionally and tactically asserted a position to Shahood's benefit. Counsel expressly stated to the District Court that the issue of comparative negligence *must* go to the jury. In other words, counsel conceded

18

that reasonable jurors could disagree on the issue of comparative negligence. Acknowledging that factual issues existed, Shahood conceded comparative negligence to bolster her argument for a partially directed verdict by narrowing the issue and underscoring that the remaining factual disputes were limited.

¶37 Further, Shahood's concession regarding comparative negligence was clearly a factor in the District Court's ruling on her partial directed verdict. In granting the motion, the District Court explained, "the [c]ourt doesn't take this matter lightly, and in my 24 years on the bench, I've never made a similar ruling at this point in a jury trial." It also recognized that while BSB did not offer evidence of an alternative cause, BSB's evidence on cross-examination supported reduced damages and it emphasized that Shahood's comparative negligence remained an issue for the jury.

¶38 Shahood cannot benefit from asserting one position—that is, her position that reasonable jurors could disagree as to Shahood's negligence—yet then assert a contrary position post-trial to the detriment of BSB—that is, that there was no evidence of Shahood's negligence. *See Bilesky*, ¶ 20. The circumstances of this case warrant treating Shahood's concessions as a judicial admission. Accordingly, Shahood conceded that reasonable jurors could disagree on the issue of comparative negligence and therefore waived the right to challenge the sufficiency of evidence supporting the jury's finding of comparative negligence.

¶39 However, regardless of whether Shahood's right to a new trial is precluded by judicial admission, the jury's finding of comparative negligence and its apportionment of fault is supported by substantial evidence and cannot be overturned.

¶40 A plaintiff is contributorily negligent when they fail to exercise reasonable care for their own safety and their failure contributes to causing their injury. *Giambra*, ¶ 44. Montana has adopted a comparative negligence scheme which compares "the conduct of the parties 'based on evidence and contributory negligence, as established by reasonable and prudent person standards.'" *Giambra*, ¶ 44 (quoting *Faulconbridge v. State*, 2006 MT 198, ¶ 99, 333 Mont. 186, 142 P.3d 777). Under § 27-1-702, MCA, a plaintiff may not recover if the plaintiff is found to be greater than fifty percent negligent. While a plaintiff who is contributorily negligent may still recover if their contributory negligence was "not greater than the negligence of the person or the combined negligence of all persons against whom recovery is sought," their recovery is reduced in proportion to the percentage attributed to their contributory negligence. Section 27-1-702, MCA. "This standard encompasses the principle that every person has a duty to exercise ordinary care for their own safety." *Est. of Mabee v. Wheatland Cnty*, 2025 MT 252, ¶ 15, ___ Mont. ___, ___ P.3d ___.

¶41 The issue of contributory negligence and the degree of comparative fault, if any, is generally an issue for the jury or fact-finder to resolve, even where a defendant is negligent as a matter of law. *Peterson v. Eichhorn*, 2008 MT 250, ¶ 32, 344 Mont. 540, 189 P.3d 615. "Whether a plaintiff was contributorily negligent is a question for the fact-finder, unless reasonable minds could not draw different conclusions from the evidence." *Peterson*, ¶ 32.

¶42 Shahood argues that a new trial is warranted because there was insufficient evidence to support the jury's verdict. However, where substantial evidence supports a verdict, the

20

verdict generally cannot be overturned or vacated. *Giambra*, ¶ 26. Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion; "it may be less than a preponderance of evidence, but [it] must be more than a 'mere scintilla.'" *Upky v. Marshall Mountain, LLC*, 2008 MT 90, ¶ 22, 342 Mont. 273, 180 P.3d 651 (citation omitted). Thus, "[a] jury's verdict may be supported by substantial credible evidence even if it is contradicted by other evidence or [is] inherently weak." *Stubblefield*, ¶ 15. In determining whether substantial evidence supports a verdict, we view the evidence in the light most favorable to the party prevailing at trial and determine only whether substantial credible evidence supports the jury's verdict. *Payne v. Knutson*, 2004 MT 271, ¶ 25, 323 Mont. 165, 99 P.3d 200. "In the case of conflicting evidence, it is not our job to second-guess the jury and retry the case." *Payne*, ¶ 25 (citation omitted).

¶43 The District Court instructed the jury that a driver has a duty to "look to where they are going and to see that which is in plain sight. . . . [A] motorist is presumed to see that which he could see by looking" and explained that liability cannot be escaped "by saying that he did not see that which was in plain view." Additionally, pursuant to § 61-8-317, MCA, the jury was instructed that "[t]he operator of a vehicle shall yield the right-of-way to an authorized vehicle that is engaged in highway maintenance activities when the authorized vehicle is displaying flashing lights that meet the requirements of the department of transportation." The instruction further provided that "Main Street in Butte is a 'highway' and 'right-of-way' means the privilege of the immediate use of the roadway."

¶44 Shahood asserts that there was no evidence that she breached any duty of care and, thus, there was no evidence of contributory negligence. Shahood further argues that she could not have foreseen that the grader would back up while spanning two lanes and that its operator would not look behind it while doing so. Shahood did not however challenge the jury instruction corresponding to § 61-8-317, MCA, or the jury instructions regarding comparative negligence. Thus, we consider Shahood's assertion regarding the insufficiency of the evidence alongside the jury instructions as given, while viewing the evidence in the light most favorable to BSB as the prevailing party.

¶45 Here, substantial evidence supports the jury's finding of Shahood's comparative negligence. Moe and Hanley both testified that Moe was actively backing up when Shahood passed him and that the grader's back-up alarm and flashing lights were both engaged. While Shahood stated that the grader appeared to be stationary and that she did not see any lights or hear any alarm, the evidence—when viewed in the light most favorable to BSB as the prevailing party—supports that the grader was reversing with both its flashing lights and back-up alarm engaged. Further, Shahood testified that she saw the grader in the center of the southbound side of Main Street as she approached, specifically stating that the grader was "occupying both the center – well, mostly . . . the center and turning lane." Shahood also stated that she had been concerned about pulling into the center lane because she was unsure of what the grader was doing. Yet, when Shahood was asked, "were you paying attention at all to the grader?" Shahood answered, "I was not." Based on this evidence, a jury could reasonably accept that Shahood failed to exercise

22

ordinary care for her own safety when she positioned her vehicle only 15 to 20 feet behind a reversing grader with its caution lights flashing and back-up alarm blaring.

¶46 A jury could also reasonably accept that Shahood was negligent by failing to yield to the grader's right-of-way. Testimony established that the lights were activated and that Moe was actively backing up while performing road maintenance. Thus, a jury could reasonably find that Moe had the right-of-way and that positioning a vehicle 15-20 feet ahead of its direct path was a failure to yield. While Shahood argues this interpretation places a duty on citizen drivers to anticipate an equipment operator's next move, we disagree. Based on Moe and Hanley's testimony, the grader was actively reversing when Shahood pulled in behind it. Accordingly, Shahood did not need to anticipate the operator's next move, she merely had a duty to yield to the operator's established right-of-way, which evidently the jury determined she failed to do. The jury's verdict is supported by substantial evidence.

## CONCLUSION

¶47 For the foregoing reasons, we conclude the District Court erred in granting Shahood's motion for new trial. Because resolution of this issue is dispositive, we need not address BSB's additional claims regarding its pre-trial motions. Accordingly, the District Court's order granting Shahood's motion for new trial is reversed and the jury's verdict reinstated.

/S/ INGRID GUSTAFSON

23

We Concur:

/S/ CORY J. SWANSON
/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ JIM RICE